**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **REPUBLIC OF KAZAKHSTAN** | ) | |
| **Ministry of Justice** | ) | |
| **Mangilik El 8** | ) | |
| **House of Ministries** | ) | |
| **Entrance 13 010000** | ) | |
| **Astana, Left Bank** | ) | |
| **Republic of Kazakhstan,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **ANATOLIE STATI** | ) | |
| **20 Dragonmirna Street** | ) | **Civil Action No. _____** |
| **Chisinau, Republic of Moldova** | ) | |
| | ) | **DEMAND FOR A JURY TRIAL** |
| **GABRIEL STATI** | ) | |
| **1A Ghioceilor Street** | ) | |
| **Chisinau, Republic of Moldova** | ) | |
| | ) | |
| **ASCOM GROUP, S.A.** | ) | |
| **75 A. Mateevici Street** | ) | |
| **Chisinau, MD-2009, Republic of Moldova** | ) | |
| | ) | |
| **TERRA RAF TRANS TRAIDING LTD.** | ) | |
| **Don House, Suite 31** | ) | |
| **30-38 Main Street, Gibraltar,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................... 1

THE PARTIES .......................................................................................................... 6

I.    PLAINTIFF ......................................................................................................... 6

II.   DEFENDANTS .................................................................................................. 7

JURISDICTION AND VENUE ................................................................................ 7

FACTS .................................................................................................................... 8

I.    THE UNDERLYING FRAUD ......................................................................... 8

    A.    The Statis Acquire Two Kazakh Companies – KPM and TNG .............. 8
    B.    Construction of the LPG Plant .............................................................. 8
    C.    The Statis Raise Funds in the United States to Fund the LPG Plant Construction Costs ............................................................................ 9
    D.    Legitimate, Third-Party Contracts For Construction of the LPG Plant ................. 16
    E.    Illegitimate, Related Party Contracts For Construction of the LPG Plant — Perkwood and the Perkwood Agreement ................................ 17
    F.    Procurement of Falsified Financial Statements .................................... 28
    G.    False Representation of Construction Costs of the LPG Plant in Audited Financial Statements ......................................................... 31
    H.    Falsified Financial Statements are Used to Obtain Bids for Purchase of the LPG Plant ............................................................ 32

II.   THE SCC AWARD WAS OBTAINED BY FRAUD ....................................... 38

    A.    Defendants Institute Arbitral Proceedings Against Kazakhstan ............ 38
    B.    In Furtherance of their Fraudulent Scheme, Defendants Present False Testimony and Evidence to the SCC Tribunal .......................... 39
    C.    The SCC Tribunal Awards Damages On the Basis of the Fraudulently Procured and Presented KMG Indicative Offer ........... 47

III.  KAZAKHSTAN BEGINS TO UNRAVEL THE FRAUDULENT SCHEME ........ 50

IV.  DEFENDANTS RESIST ANNULMENT OF THE FRAUDULENTLY PROCURED SCC AWARD ......................................................................... 52

V.   DEFENDANTS ATTEMPT TO ENFORCE THE SCC AWARD .................... 55

    A.    The Washington Enforcement Proceedings ......................................... 55
    B.    The London Enforcement Proceedings ................................................ 59
    C.    The New York Enforcement Proceedings ........................................... 64
    D.    Other European Enforcement Actions ................................................. 65

VI.  DEFENDANTS INSTITUTE SECTION 1782 PROCEEDINGS IN THE UNITED STATES ......................................................................................... 68

DAMAGES SUFFERED BY KAZAKHSTAN ....................................................... 71

COUNT I  RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
CONDUCTING THE AFFAIRS OF THE ENTERPRISE THROUGH A
PATTERN OF RACKETEERING ACTIVITY ................................................. 71

I.      The Enterprise ................................................................................................. 71

II.     The Pattern of Racketeering Activity ................................................................. 73

COUNT II  RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
CONSPIRACY TO CONDUCT THE AFFAIRS OF THE ENTERPRISE
THROUGH A  PATTERN OF RACKETEERING ACTIVITY IN VIOLATION
OF § 1962(C) .................................................................................................... 89

COUNT III FRAUD ............................................................................................... 91

COUNT IV CIVIL CONSPIRACY ........................................................................ 92

## INTRODUCTION

1.      This civil action is brought by Plaintiff Republic of Kazakhstan ("Kazakhstan" or "Plaintiff") against Defendants Anatolie Stati and Gabriel Stati (collectively, "the Statis"), and two companies controlled by the Statis:  Ascom Group, S.A. ("Ascom") and Terra Raf Trans Traiding Ltd. ("Terra Raf") (collectively, "Defendants"). Kazakhstan seeks redress for Defendants' violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*., and commission of the common law torts of fraud and civil conspiracy. Kazakhstan seeks recovery for the monetary damages it has suffered as a result of Defendants' illegal conduct, including compensatory and punitive damages, and injunctive relief.

2.      Defendants, through actions known and unknown in the United States and abroad, have and continue to be engaged in a sophisticated and wide-ranging illegal pattern of racketeering through an associated-in-fact enterprise of individuals and corporate entities. The pattern of racketeering consists of multiple acts of mail fraud, wire fraud and money laundering. Together and acting in concert with others, Defendants engaged in a fraudulent scheme to injure Kazakhstan, and other victims, in their money and property and/or to unjustly enrich themselves. The pattern of racketeering described herein was carried out through multiple corporate entities ultimately controlled by the Statis (the "Stati Companies") and individuals controlled by the Statis.

3.      Defendants' fraudulent scheme was carried out through multiple acts in the United States, and other jurisdictions, and caused injury in the United States.

4.      Defendants' fraudulent scheme was accomplished through a complex enterprise of individuals and corporate entities, engaging in multiple acts over more than a decade.

Defendants' operations were financed by raising monies from investors, including investors located in the United States.

5.       One element of Defendants' fraudulent scheme concerned a liquefied petroleum gas plant (the "LPG Plant") in Kazakhstan. Anatolie Stati, or in the alternative the Statis and/or the Stati Companies, falsely represented to outside parties that they engaged in arms-length transactions with an unrelated third-party, Perkwood Investment Limited ("Perkwood"), in connection with construction of the LPG Plant. In reality, Perkwood was a sham company that was wholly controlled by the Statis. Through a series of undisclosed related party transactions involving Perkwood and the use of falsified financial statements, the Statis fraudulently inflated the construction costs of the LPG Plant. Defendants then used these falsified costs and financial statements to fraudulently obtain a bid for the LPG plant from the Kazakh state oil and gas company.

6.       On July 26, 2010, Defendants instituted an arbitral proceeding before the Stockholm Chamber of Commerce ("SCC") in Stockholm, Sweden against Kazakhstan, purportedly under the terms of the Energy Charter Treaty ("ECT") (the "SCC Arbitration"). Defendants used the fraudulently obtained bid, and their falsified costs and falsified financial statements, as evidence of the LPG plant's value in the SCC Arbitration. In December 2013, the SCC Tribunal issued an award in favor of Defendants in the total amount of $497,685,101.00, plus $8,975,496.40 in costs, of which $199 million was awarded to Defendants for the LPG Plant (the "SCC Award").

7.       Defendants affirmatively concealed the underlying fraud regarding the amount of construction costs of the LPG Plant during the SCC Arbitration. Specifically, Defendants submitted false testimony and evidence regarding the amount invested in the LPG Plant, and

- 2 -

deliberately withheld relevant documents from production. Defendants thus knowingly advanced a false case before the SCC Tribunal and ultimately procured the SCC Award through fraud.

8.      Defendants continued their fraudulent scheme by seeking to enforce and/or collect on the SCC Award in multiple jurisdictions.

9.      In the United States, on February 4, 2014, Defendants filed a petition to confirm the fraudulently procured SCC Award in this Court under the United Nations Convention for the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), as incorporated in the Federal Arbitration Act. *See Anatolie Stati et al. v. Republic of Kazakhstan*, No. 14-cv-00175 (ABJ) (D.D.C.). Defendants voluntarily dismissed this action and then re-filed it on September 30, 2014. *See Anatolie Stati et al. v. Republic of Kazakhstan*, No. 14-cv-1638 (ABJ) (D.D.C.) ("Washington Enforcement Proceedings"). This action is pending before this Court.

10.     In England, on February 24, 2014, Defendants initiated proceedings to enforce the fraudulently procured SCC Award in the High Court of Justice, Queen's Bench Division, Commercial Court (the "London Court") in London, captioned *Anatolie Stati et al. v. Republic of Kazakhstan*, CL-2014-000070 (the "London Enforcement Proceedings"). These proceedings were brought under the New York Convention, as incorporated in the English Arbitration Act 1996.

11.     Defendants continued their fraudulent conduct by opposing proceedings instituted by Kazakhstan on March 19, 2014 to set-aside and/or annul the SCC Award in Sweden, captioned *Republic of Kazakhstan v. Ascom Group S.A., et al.*, Case No. T 2675-14 (the "Swedish Annulment Proceedings"). In the Swedish Annulment Proceedings, Defendants falsely represented that the fraudulently obtained SCC Award was valid and should not be set-aside.

12.     Separately, starting in December 2014, Defendants instituted multiple proceedings pursuant to 28 U.S.C. § 1782 for court approval to issue subpoenas in the United States to obtain information regarding Kazakhstan's assets, purportedly to aid in execution of the fraudulently procured SCC Award outside the United States. During the period from December 2014 to February 2015, three such proceedings were instituted in the U.S. District Court for the Southern District of New York. In February 2015, one such proceeding was instituted in the U.S. District Court for the District of Massachusetts. Defendants continue to take actions in New York and Massachusetts in connection with subpoenas issued in these proceedings.

13.     Kazakhstan began to unravel Defendants' fraudulent scheme while the Washington Enforcement Proceedings, the London Enforcement Proceedings and the Swedish Annulment Proceedings were ongoing. Specifically, on March 27, 2015, Kazakhstan filed a 28 U.S.C. § 1782 petition in the U.S. District Court for the Southern District of New York, captioned *In re Ex Parte Application of Petitioner Republic of Kazakhstan for an Order Directing Discovery from Clyde & Co. LLP Pursuant to 28 U.S.C. § 1782*, No. 1:15-mc-0081-P1 (S.D.N.Y.) ("New York § 1782 Proceedings"). In its petition, Kazakhstan sought permission to seek discovery from Clyde and Co., the law firm that represented Vitol, a global energy and commodities company that previously engaged in several arbitration proceedings against certain Stati Companies that also concerned the value of the LPG Plant (the "Vitol Arbitrations"). The basis for Kazakhstan's 28 U.S.C. § 1782 petition was the information and belief that Anatolie Stati, or in the alternative the Statis and/or the Stati Companies, were incentivized to claim a different, lower value for LPG Plant in the Vitol Arbitrations than they had claimed in the SCC Arbitration.

14.     Defendants intervened and objected to Kazakhstan's 28 U.S.C. § 1782 petition in an effort to prevent Kazakhstan from obtaining documents from the Vitol Arbitrations. On June 22, 2015, the Southern District of New York (Hon. J. Stein) rejected Defendants' objections, thus allowing Kazakhstan to obtain the documents from the Vitol Arbitrations. Through these documents, and additional investigations, which are ongoing, Kazakhstan discovered Defendants' fraudulent scheme.

15.     In the London Enforcement Proceedings, Kazakhstan applied for permission to amend its pleadings to introduce evidence of Defendants' fraud. Defendants repeatedly resisted Kazakhstan's application.

16.     On June 6, 2017, on the basis of extensive evidence and legal submissions, the London Court granted Kazakhstan's application to amend, concluding that "there is a sufficient prima facie case that the [SCC] Award was obtained by fraud," and that the interests of justice require that Kazakhstan's fraud allegations be "examined at trial and decided on their merits."

17.     After the London Court issued its finding of a *prima facie* case of fraud, Defendants initiated additional enforcement proceedings in the New York Supreme Court on June 15, 2017, in which they are attempting to enforce, *inter alia*, the amount of the fraudulently procured SCC Award, purportedly under the New York Uniform Foreign Country Money-Judgments Recognition Act. That action is pending in the U.S. District Court for the Southern District of New York and is captioned *Anatolie Stati et al. v. Republic of Kazakhstan*, No. 1:17-cv-005742-RA (S.D.N.Y.) (the "New York Enforcement Proceedings").

18.     Also after the London Court's finding of a *prima facie* case of fraud, Defendants initiated in August 2017 a serious of *ex parte* actions in Europe to attempt to enforce the fraudulently procured SCC Award. Without disclosing the findings and the order of the London

Court, Defendants filed *ex parte* applications in Sweden, the Netherlands, and Luxembourg. Solely based on the information provided by Defendants, the courts of Sweden, Netherlands and Luxembourg issued a serious of interim measures, including the freezing of the Kazakh Embassy accounts in Sweden. Kazakhstan is now forced to defend against these measures in each of these jurisdictions.

*****

19.     Kazakhstan demands judgment in an amount equal to three times the damage caused to Kazakhstan by Defendants' racketeering activity, pursuant to 18 U.S.C. § 1964(c).

20.     Kazakhstan also demands an injunction prohibiting Defendants from filing or prosecuting:  (i) any action in the United States for enforcement, confirmation, or recognition of the SCC Award; (ii) any action in the United States for enforcement, confirmation, or recognition of any foreign judgment relating to the SCC Award, including but not limited to any foreign judgment enforcing, confirming, or recognizing the SCC Award; (iii) any action in the United States seeking the seizure or attachment of assets based on any foreign judgment relating to the SCC Award, including but not limited to any foreign judgment enforcing, confirming, or recognizing the SCC Award; and (iv) any action in the United States pursuant to 28 U.S.C. § 1782 seeking discovery in aid of foreign proceedings relating to the SCC Award.

21.     Further, Kazakhstan demands compensatory and punitive damages, attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## THE PARTIES

### I.     PLAINTIFF

22.     Republic of Kazakhstan is a sovereign state.

## II.    DEFENDANTS

23.    Anatolie Stati is an individual. On information and belief, he is a natural citizen of Moldova and Romania and his address is 20 Dragonmirna Street, Chisinau, Republic of Moldova.

24.    Gabriel Stati is an individual. On information and belief, he is the son of Anatolie Stati and a natural citizen of Moldova and Romania. On information and belief, his address is 1A Ghioceilor Street, Chisinau, Republic of Moldova.

25.    On information and belief, Ascom is a joint stock company incorporated under the laws of Moldova, with headquarters located at 75 A. Mateevici Street, Chisinau, MD-2009, Republic of Moldova. Anatolie Stati owns one-hundred (100) percent of Ascom.

26.    On information and belief, Terra Raf is a limited liability company incorporated under the laws of Gibraltar, with an address at Don House, Suite 31, 30-38 Main Street, Gibraltar. Anatolie Stati and Gabriel Stati each own fifty (50) percent of Terra Raf.

## <u>JURISDICTION AND VENUE</u>

27.    This action asserts claims under RICO and state law.

28.    This Court has subject matter jurisdiction over the claims arising under RICO pursuant to 18 U.S.C. § 1964(a) and (c) and 28 U.S.C. § 1331 and over the claims arising under state law pursuant to 28 U.S.C. § 1367(a).

29.    This Court has personal jurisdiction over Defendants because they filed an action in this Court against Kazakhstan — the Washington Enforcement Proceedings — in furtherance of their fraudulent scheme. *See Anatolie Stati et al. v. Republic of Kazakhstan*, No. 14-cv-1638 (ABJ) (D.D.C.).

30.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965(a) and (b).

## FACTS

### I.     THE UNDERLYING FRAUD

#### A.     The Statis Acquire Two Kazakh Companies – KPM and TNG

31.     During the period between 1999 and 2004, the Statis acquired one-hundred (100) percent of the shares in two Kazakh companies, Kazpolmunay LLP ("KPM") and Tolkynneftegaz LLP ("TNG"). Prior to their acquisition by the Statis, KPM and TNG had obtained approval from Kazakhstan to explore and develop various oil and gas fields in Kazakhstan pursuant to Subsoil Use Contracts.

32.     KPM and TNG are ultimately controlled by the Statis, through their ownership interests in other corporate entities. KPM is wholly-owned by Ascom, which in turn is wholly-owned by Anatolie Stati. TNG is wholly-owned by Terra Raf, which in turn is owned in equal shares by the Statis. At all relevant times, the Statis had the power and discretion to direct the actions of KPM and TNG.

33.     Anatolie Stati also wholly owns Tristan Oil Ltd. ("Tristan"), a special purpose vehicle organized in the British Virgin Islands that was formed for the sole purpose of financing the operations of KPM and TNG. Anatolie Stati served as President and CEO of Tristan and Chairman of its board of directors.

#### B.     Construction of the LPG Plant

34.     On June 27, 2006, certain Stati Companies entered into a Joint Operating Agreement (the "JOA") with Vitol to construct the LPG Plant. The parties to the JOA are Vitol FSU B.V. ("Vitol FSU"), on one side, and Ascom, TNG, and Terra Raf, on the other side.

35.     Anatolie Stati made all important decisions relating to the LPG Plant.

36.     The recitals in the JOA memorialized, among other things, that Vitol FSU and Ascom "have agreed to make investments in the [LPG] Plant as provided for in this Agreement." Vitol FSU and Ascom agreed to fund the construction by each investing $20 million in equity, and Terra Raf undertook to arrange the financing of the remaining balance. The "equity" financing on the side of Ascom was arranged through a purported investment loan agreement from Ascom to TNG. With respect to the remaining "debt" financing, TNG initially obtained a loan from the Kazakh bank, Kazkommerz Bank. This loan subsequently was refinanced through the issuance of notes by Tristan.

37.     The JOA distinguishes between the "real net value" of the LPG Plant and the "reported value in the Kazakh book." Section 8.1 of the JOA provides that after a certain point in time, Vitol FSU was entitled to 50% of the Net Profit, to be calculated by taking into account the "real value of the Plant rather than the reported value in the Kazakh book."

C.     **The Statis Raise Funds in the United States to Fund the LPG Plant Construction Costs**

38.     To fund their obligations under the JOA, the Statis raised money from investors, including but not limited to investors in the United States.

39.     The Statis raised funds through Tristan, which is wholly-owned by Anatolie Stati. On information and belief, Tristan has maintained bank accounts in the United States, and may continue to maintain bank accounts in the United States at present.

1.     **The December 20, 2006 Indenture**

40.     On December 20, 2006, Tristan, KPM and TNG entered into an Indenture with Wells Fargo Bank, National Association ("Wells Fargo"). The purpose of the Indenture was to finance the operations of KPM and TNG.

- 9 -

41.     Pursuant to the Indenture, and its amendments dated May 21, 2007 and June 6, 2007, Tristan issued Notes in the aggregate principal amount of $300 million on or about December 20, 2006, and Notes in the aggregate principal amount of $120 million on or about June 7, 2007.

42.     Section 1.01 states that Notes will be "sold in reliance on Rule 144A." Rule 144A is a safe harbor on which non-U.S. companies rely when accessing the U.S. capital markets. It provides an exemption from the registration requirements of Section 5 of the Securities Act of 1933, 15 U.S.C. §77a *et seq.*, for certain offers and sales of qualifying securities by certain persons other than the issuer of the securities. The exemption applies to resales of securities to qualified institutional buyers. The securities eligible for resale under Rule 144A are securities of U.S. and foreign issuers that are not listed on a U.S. securities exchange or quoted on a U.S. automated inter-dealer quotation system.

43.     Pursuant to Section 11.01(a) of the Indenture, KPM and TNG jointly and severally guaranteed Tristan's obligations under the Indenture.

44.     Wells Fargo served as Trustee under the Indenture. Wells Fargo's corporate trust office is located in Minneapolis, Minnesota.

45.     The following investors, among possible others, purchased the Notes:  (i) Argo Capital Investors Fund SPC – Argo Global Special Situations Fund; (ii) Argo Distressed Credit Fund; (iii) Black River Emerging Markets Fund Ltd.; (iv) Black River EMCO Master Fund Ltd.; (v) Black River Emerging Markets Credit Fund Ltd.; (vi) BlueBay Multi-Strategy (Master) Fund Limited; (vii) BlueBay Specialised Funds:  Emerging Market Opportunity Fund (Master); (viii) CarVal Master S.a.r.l; (ix) CVI GVF (Lux) Master S.a.r.l. (by CarVal Investors, LLC Its Attorney-in-Fact); (x) Deutsche Bank AG London; (xi) Goldman Sachs International; (xii)

Gramercy Funds Management LLC (not in its individual capacity but solely on behalf of its investment funds and managed accounts holding the notes); (xiii) Latin America Recovery Fund LLC; (xiv) Outrider Management LLC (on behalf of Outrider Master Fund, LP); (xv) Standard Americas, Inc.; and (xvi) Standard Bank Plc.

46.     The Indenture contained covenants regarding financial transactions and reporting to protect the rights of the Noteholders.

47.     First, Section 4.12 of the Indenture limited Tristan, KPM and TNG's ability to, *inter alia*, enter into transactions with "Affiliates." The "Affiliate" of any Person is defined to mean "any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such [] Person." In turn, "Control," is defined to mean the "possession, directly or indirectly, of the power to direct or cause the direction of management or policies of such Person, whether through the ownership or voting security, by agreement or otherwise; *provided* that beneficial ownership of 10% or more of the Voting Stock of a Person will be deemed to be control."

48.     Section 4.12 of the Indenture stated that Tristan, KPM and TNG could not "make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate," unless:

• If the aggregate consideration was in excess of $1.0 million, the transaction was required to be on an arm's length basis (*i.e.*, the transaction was on "terms that are no less favorable to [Tristan] or to [KPM or TNG] than those that would have

been obtained in a comparable transaction by [Tristan] or [KPM or TNG] with an
unrelated Person");

- If the aggregate consideration was in excess of $3.0 million, Tristan was required
to deliver to the Trustee (*i.e.*, Wells Fargo) a resolution of Tristan's board of
directors set forth in an Officers' Certificate certifying that by a majority of the
disinterested members of the board of directors and at least one independent
director of the board of directors have determined that the transaction complied
with Section 4.12;

- If the aggregate consideration was in excess of $10.0 million, Tristan was
required to deliver to the Trustee (*i.e.*, Wells Fargo) "an opinion as to the fairness
to [Tristan] or [KPM or TNG] of such Affiliate Transaction from a financial point
of view issued by an accounting, appraisal or investment banking firm of national
standing[.]"

49.     Second, Section 4.03 of the Indenture required KPM and TNG to produce
combined financial statements with Tristan on a quarterly and annual basis, as well as a reserve
report from an independent petroleum engineer on an annual basis. Tristan, KPM and TNG also
were required to conduct conference calls to discuss the information furnished in the financial
statements and reserve reports, and post the reports on Tristan's website.

50.     Third, Section 4.04(a) of the Indenture also required Tristan, KPM and TNG to
deliver to the Trustee, *i.e.*, Wells Fargo, within ninety (90) days after the end of each fiscal year,
an Officers' Certificate stating that a review of the activities of Tristan had been made "with a
view to determining whether [Tristan] has kept, observed, performed and fulfilled its
obligations" under the Indenture, and stating that, for each Officer signing the certificate, "to the

best of his or her knowledge [Tristan] has kept, observed, performed and fulfilled each and every covenant" of the Indenture and "is not in default in the performance or observation of any of the terms, provisions and conditions" of the Indenture.

51.     Section 4.04(b) of the Indenture further required that the year-end financial statements delivered pursuant to Section 4.03 be accompanied by a written statement of Tristan's independent public accountants that "in making the examination necessary for certification of such financial statements, nothing has come to their attention that would lead them to believe that [Tristan] has violated any of the provisions of Article 4 or Article 5 hereof, or if any such violation has occurred, specifying the nature and period of existence thereof", including, *inter alia*, Section 4.12's restrictions on transactions with Affiliates.

52.     Anatolie Stati, or in the alternative the Statis and/or the Stati Companies, represented to the purchasers of the Notes that the monies raised from the Notes would be invested in KPM and TNG, for the purpose of exploring and/or developing oil and gas fields in Kazakhstan. Specifically, Anatolie Stati, or in the alternative the Statis and/or the Stati Companies, represented that proceeds from the Notes would be used to repay KPM and TNG's existing debt, and to fund KPM and TNG's working capital, general corporate purposes, and capital expenditures. On information and belief, these representations were false. As alleged below, Anatolie Stati, or in the alternative the Statis and/or the Stati Companies, orchestrated multiple undisclosed related party transactions through which TNG's reported costs were artificially inflated.

### 2.      The December 17, 2012 Sharing Agreement

53.     On December 17, 2012, Defendants as well as Tristan, on the one side, and a certain number of Tristan Noteholders (the so-called "Majority Noteholders"), on the other side,

entered into a so-called "Sharing Agreement and Assignment of Rights" (the "Sharing Agreement"). Through the Sharing Agreement, a new type of Tristan Notes (the "Modified Tristan Notes") was created. These Modified Tristan Notes were necessary in order to implement the modifications created through the Sharing Agreement.

54.     Following the conclusion of the Sharing Agreement, a consent solicitation procedure took place in which Tristan Noteholders that had not been party to the Sharing Agreement could agree to the modified terms and exchange their Tristan Notes for Modified Tristan Notes. The consent solicitation ended on February 14, 2013 with Tristan Noteholders representing 99.8% of the principal amount of the Tristan Notes agreeing to the modified terms.

55.     Under the Sharing Agreement, any amounts collected by Defendants on the SCC Award (the "Proceeds") are to be paid on an account administered by a security agent. The Sharing Agreement defines the security agent as Wilmington Trust, National Association or any successor thereto. On information and belief, Wilmington Trust, National Association is based in Wilmington, Delaware.

56.     The Sharing Agreement provides for a mechanism of the distribution of the Proceeds paid into the account among Defendants and the Tristan Noteholders. The Sharing Agreement provides also for certain mechanisms based on which Defendants can be released from their obligations under the Sharing Agreement. One significant mechanism is compliance by Defendants with the provisions of the Sharing Agreement and the making of a certain minimum payment.

57.     The Sharing Agreement amended the Notes to release Defendants and Tristan from liability to the Noteholders. Section 7 of Modified Notes (attached to the Sharing Agreement) provides:

*(7) RELEASES.*

*(a) Effective upon the date this Note is redeemed pursuant to Section 5, the Holder of this Note shall be deemed to grant to the Tristan Parties the following release: The Holder of this Note, for itself and its successors, assigns and heirs (the "Releasors"), to the fullest extent permitted by applicable law, hereby releases and forever discharges each of the Tristan Parties and the Guarantors and each of their respective past, present and future affiliates, directors, officers, stockholders, partners (general and limited), members, employees, agents, consultants, advisors, fiduciaries, and other representatives (including, without limitation, legal counsel, investment bankers, accountants and financial advisors), and all of the foregoing Persons' successors, assigns and heirs (individually, a "Releasee" and collectively, "Releasees") from any liability or obligation, and covenants not to assert, bring or instigate against the Releasees any claims, demands, proceedings, actions, causes of action, investigations, litigations or suits (whether civil, criminal, administrative, investigative, or informal), whether sounding in contract (including this Note and the Indenture), tort or otherwise, by reason of, relating to or arising from the fact that the Releasor is or was a holder of this Note, which any Releasor now has, has ever had, or may hereafter have against any Releasee (the "Releases').*

*(b) ...*

*The holder of this Note, for itself and its successors, assigns and heirs (the "Releasors"), to the fullest extent permitted by applicable law, hereby releases and forever discharges each of the Tristan Parties and the Guarantors and each of their respective past, present and future affiliates, directors, officers, stockholders, partners (general and limited), members, employees, agents, consultants, advisors, fiduciaries, and other representatives (including, without limitation, legal counsel, investment bankers, accountants and financial advisors), and all of the foregoing Persons' successors, assigns and heirs (individually, a "Releasee" and collectively, "Releasees") from any and all liability or obligation, and covenants not to assert, bring or instigate any claims, demands, proceedings, actions, causes of action, investigations, litigations or suits (whether civil, criminal, administrative, investigative, or informal), whether sounding in contract (other that [sic] as set forth below), tort or otherwise ("Claims"), which any Releasor now has, has ever had, or may hereafter have against any Releasee (the "Releases"); notwithstanding the foregoing, the Release in this Section 7(b) shall not apply to any liability, obligation or Claim that a Holder may have against the Company any Guarantor and all other obligors under the Indenture, the Notes (including the Modified Notes), the Note Guarantees, the Pledge Agreements, the related security documents, the Security and Collateral Assignment Agreement, the Secured*

> *Obligations and the Collateral (but specifically excluding A. Stati, G. Stati*
> *and any of their family members, except to the extent of their respective*
> *obligations under the Sharing Agreement to collect, account for and deposit*
> *into the Account Proceeds from an Award) pursuant to this Note or the*
> *Indenture or any security documents relating thereto, including the Pledge*
> *Agreements and pursuant to any promissory note pledged under the Pledge*
> *Agreements, including by Terra Raf Trans Traiding Ltd.*

**D.     Legitimate, Third-Party Contracts For Construction of the LPG Plant**

58.     In connection with the construction of the LPG Plant, Anatolie Stati, or in the

alternative the Statis and/or the Stati Companies, entered into certain legitimate contracts with

third parties.

59.     On January 31, 2006, a Stati Company called Azalia contracted with an

independent third party, TGE Gas Engineering GmbH, formerly Tractebel Gas Engineering

GmbH ("TGE"), to design and supply the principal equipment components of the LPG Plant (the

"TGE Contract"). The original contract price under the TGE Contract was approximately EUR

28.38 million. This is equivalent to approximately US $34.29 million, at the January 31, 2006

published exchange rate of 1.20825 Euro to the U.S. Dollar. The TGE Contract price was

subsequently amended to EUR 29.01 million. This amount is equivalent to approximately U.S.

$35.05 million, at the same January 31, 2006 exchange rate.

60.     Ascom also contracted with TGE to provide supervision and other services on the

construction site, to be charged separately on an hourly basis.

61.     TGE completed delivery of the equipment of the main components of the LPG

Plant in 2007, and these components were incorporated into the LPG Plant by October 2008.

62.     By October 2008, TGE had designed and supplied all of the main items of

equipment that had been contemplated under the TGE Contract, and these items had been

incorporated into the LPG Plant.

63.     TGE's total remuneration for its work on the LPG Plant was EUR 31.04 million, comprising (i) the equipment price of EUR 29.01 million under the TGE Contract and (ii) an additional EUR 2.02 million for supervision services provided by TGE in connection with construction of the LPG Plant.

64.     On or around March 12, 2009, the construction of the LPG Plant was abandoned. By that point in time, the LPG Plant was approximately 80-90% complete.

**E.    Illegitimate, Related Party Contracts For Construction of the LPG Plant — Perkwood and the Perkwood Agreement**

65.     As part of the fraudulent scheme, Anatolie Stati, or in the alternative the Statis and/or the Stati Companies, created a number of illegitimate contractual documents with related parties for the purpose of artificially inflating the construction costs of the LPG Plant.

66.     The initial related party contract was an equipment procurement and construction contract (the "EPC Contract"), dated March 31, 2005, between TNG and Kaspy Asia Service Company Limited ("KASKO"). KASKO is another Stati Company.

67.     On February 17, 2006, the scope of the EPC Contract was amended to remove the procurement of equipment for the LPG Plant, such that TNG itself assumed the obligation to procure the LPG Plant equipment.

68.     On that same date, February 17, 2006, Anatolie Stati, or in the alternative the Statis and/or the Stati Companies, created a document that, on its face, purports to be a contract between TNG and a separate company with a London address called Perkwood Investment Limited ("Perkwood"). The stated purpose of this document was the purchase of equipment for the LPG Plant, and it is titled "Sale and Purchase Agreement." This document is referred to in this Complaint as the "Perkwood Agreement." The Perkwood Agreement does not disclose that Perkwood is a Stati Company.

69.     Perkwood and the Perkwood Agreement are central to the fraudulent scheme. Perkwood was a sham company and the Perkwood Agreement was a sham contract.

70.     Perkwood was incorporated in England and Wales on September 14, 2005 and dissolved on May 3, 2011. At all material times, Perkwood was under the ultimate ownership and/or control of the Statis.

71.     The Statis were the signatories and sole beneficiaries of Perkwood's bank account held at Rietumu Bank in Latvia.

72.     Sarah Petre-Mears was Perkwood's sole director. Edward Petre-Mears was Perkwood's company secretary. These persons are known to be sham directors according to public sources of information. Sarah Petre-Mears is reported to be the "director" of more than 1,200 companies across the Caribbean, the Republic of Ireland, New Zealand and the United Kingdom.

73.     Perkwood never had any employees. It never paid any taxes, salaries, or rent, and it did not incur any other costs normally incurred by a company that actually carries out business.

74.     From 2006 to 2009 — the same time period when Perkwood purportedly was engaging in multi-million dollar transactions with TNG under the Perkwood Agreement — as alleged below — Perkwood filed dormant accounts with the British Companies House. Under English law, for a company to legally file dormant accounts, that company must not have carried out any business transactions for the relevant time period. Thus, Perkwood was supposedly engaged in substantial business transactions with TNG during the same exact time period in which it claimed to the U.K. government that it was "dormant."

75.     By written power of attorney dated November 2, 2005, "Perkwood" appointed Anatolie Stati and Gabriel Stati as its agents with unlimited authority to represent Perkwood.

This power of attorney came shortly before the date of the Perkwood Agreement (and TGE Contract). "Perkwood" annually reviewed the power of attorney on September 14, 2006, August 22, 2007, and August 26, 2008. Further, by a written power of attorney dated August 20, 2009, "Perkwood" appointed Anatolie Stati as its agent with unlimited authority to represent Perkwood. Anatolie Stati, or in the alternative the Statis and/or the Stati Companies, caused these powers of attorney to be executed.

76.     Kazakhstan first obtained copies of these powers of attorney in 2016. It was only the first day of the hearing in the Swedish Annulment Proceedings in September 2016, after having been previously confronted with these powers of attorney, that Defendants were finally forced to concede that Perkwood was a Stati Company. Prior to this, Defendants had concealed (or refused to admit) that Perkwood was a Stati Company, including in their submissions in the SCC Arbitration and Swedish Annulment Proceedings.

**The Perkwood Agreement**

77.     The date of the Perkwood Agreement — February 17, 2006 — is eighteen (18) days after the date of the TGE Contract — January 31, 2006.

78.     The initial contract price under the Perkwood Agreement was $115 million, purportedly for the purchase of equipment for the LPG Plant.

79.     In comparison, the initial TGE Contract price, for the actual purchase of equipment for the LPG Plant, was equivalent to approximately only $34.29 million.

80.     The amount of the Perkwood Agreement was subsequently increased through a number of amendments — first to $155 million, and then to approximately $185 million. Various annexes to the Perkwood Agreement, executed from time to time, specified the equipment that

Perkwood was to "sell" to TNG, and the price that TNG was to pay to Perkwood. The total of the prices set out in these annexes was stated to be "approximately $191 million."

81.     In comparison, the total value of the TGE Contract, after amendments, was EUR 29.01 million, which is equivalent to only U.S. $35.05 million (at the same January 31, 2006 exchange rate). And, TGE's total remuneration for its work on the LPG Plant, including the services it provided, was EUR 31.04 million, which is equivalent to only U.S. $37.5 million (using the same January 31, 2006 exchange rate).

82.     The $191 million total stated value of the Perkwood Agreement was false and fraudulent. Anatolie Stati, or in the alternative the Statis and/or the Stati Companies, used a number of schemes to artificially inflate the construction costs of the LPG Plant through Perkwood and the Perkwood Agreement. These schemes include but may not be limited to:  (1) the "**Repurchase and Fictitious Parts Fraud**"; (2) the "**Management Fee Fraud**"; (3) the "**Equipment for Construction Fraud**"; and (4) the "**Interest Fraud.**" These fraudulent related party transactions are detailed below.

### 1.     The Repurchase and Fictitious Parts Fraud

83.     Pursuant to the Repurchase Fraud, Anatolie Stati, or in the alternative the Statis and/or the Stati Companies, caused TNG purportedly to repurchase equipment for the LPG Plant from Perkwood at artificially inflated prices when the same equipment had already been supplied (at a much lower cost) by TGE to Azalia under the TGE Contract. Specifically, Annex 2 to the Perkwood Agreement, dated March 27, 2006, included the following fictitious and/or fraudulent transactions:

1)     TNG agreed to purchase a "Gas de-carbonization and de-sulphurisation unit" from Perkwood for $19,564.267.00. This same equipment already

had been purchased by Azalia, on behalf of the Stati Companies, from TGE pursuant to the TGE Contract as amended for EUR 6,313,180.00 (at the time equivalent to U.S. $7,674,301.61) — an increase of $11,889,965.39.

2)      TNG agreed to purchase an "LPG Recovery Unit" from Perkwood for $38,648,885.00. This same equipment had already been purchased by Azalia, on behalf of the Stati Companies, from TGE pursuant to the TGE Contract for EUR 11,352,000.00 (at the time equivalent to U.S. $13,799,491.20) — an increase of $24,849,393.80.

3)      TNG agreed to purchase a "Sales Gas Compression Unit" from Perkwood for $34,882,756.00. This same equipment had already been purchased by Azalia, on behalf of the Stati Companies, from TGE pursuant to the TGE Contract for EUR 11,352,000.00 (at the time equivalent to U.S. $13,799,491.20) — an increase of $21,083,264.80.

84.      Pursuant to the Fictitious Parts Fraud, Anatolie Stati, or in the alternative the Statis and/or the Stati Companies, caused TNG to purchase equipment from Perkwood for the LPG Plant that was not and/or could not legitimately have been required for the construction of the LPG Plant, and was never in fact delivered to the construction site of the LPG Plant, in order to fictitiously inflate the construction costs of the LPG Plant. This fraud was conducted pursuant to Annexes 14 and 16 of the Perkwood Agreement, which were dated December 2, 2008 and May 18, 2009, respectively. Specifically:

1)      Through Annex 14, TNG agreed to purchase equipment described as "Heat exchangers (coolers) of stainless steel cold area" from Perkwood for

$12,076,370.00. This equipment corresponded and/or was functionally
identical to equipment that TGE had already supplied to Azalia on behalf
of the Stati Companies pursuant to the TGE Contract (Appendix 1, item
3.3, part numbers E3001, E3002, E3003), and therefore could not
legitimately have been required for the LPG Plant.

2)      Through Annex 14, TNG agreed to purchase equipment described as "Gas
turbo compressors SOLAR" from Perkwood for $6,713,446.00. This
equipment corresponded and/or was functionally identical to equipment
that TGE had already supplied to Azalia pursuant to the TGE Contract as
the "Sales Gas Compression Unit," and therefore could not legitimately
have been required for the LPG Plant. This equipment had also already
been re-purchased by TNG from Perkwood under Annex 2 of the
Perkwood Agreement, as set forth above in the description of the
Repurchase Fraud.

3)      Through Annex 14, TNG agreed to purchase equipment described as a
"Turboexpander Mafi-Trench" from Perkwood for $3,095,173.00. This
equipment corresponded and/or was functionally identical to equipment
that TGE had already supplied to Azalia pursuant to the TGE Contract as
the "LPG Recovery Unit," and therefore could not legitimately have been
required for the LPG Plant. This equipment had also already been re-
purchased by TNG from Perkwood under Annex 2 of the Perkwood
Agreement, as set forth above in the description of the Repurchase Fraud.

4)      Through Annex 16, TNG agreed to purchase 50,400 kilograms of a

substance known as methyldiethonalamine (sMDEA), a liquid used in the

operation of the LPG Plant, from Perkwood for $288,792.00. However, (i)

this liquid had already been supplied to Azalia by TGE pursuant to the

TGE Contract and (ii) by the time that Annex 16 was executed in May

2009, construction of the LPG Plant had already been abandoned.

85.     Perkwood (i) was not the true supplier to TNG of any of the goods and equipment
that it had purportedly contracted to supply pursuant to Annex 2; and (ii) did not actually supply
TNG with any of the goods and equipment that it had purportedly contracted to supply pursuant
to Annex 14 and Annex 16.

86.     Neither Perkwood nor TNG ever intended that (i) Perkwood would supply TNG
with any of the goods and equipment that it had purportedly contracted to supply pursuant to
Annexes 2, 14, and 16; or (ii) Annexes 2, 14, and 16 would create any obligation on Perkwood to
supply TNG with any of the goods and equipment that it had purportedly contracted to supply
thereunder.

87.     Annexes 2, 14, and 16 to the Perkwood Agreement therefore were sham contracts
and/or documentation.

88.     Kazakhstan does not yet know whether the remaining annexes to the Perkwood
Agreement comprise genuine contracts or further scams, and/or further devices intended to
artificially inflate the construction costs of the LPG Plant.

**2.      The Management Fee Fraud**

89.     Anatolie Stati, or in the alternative the Statis and/or the Stati Companies, created a
fictitious $43,852,108.00 "management fee" included in the total amount of the Perkwood

Agreement. This fee (i) had no contractual basis, whether in the Perkwood Agreement or

otherwise; and (ii) was not paid (or purportedly paid) in consideration for any services actually

provided by or on behalf of Perkwood. Specifically:

1)   The $43,852,108.00 "management fee" did not form part of the "original

cost of the services and equipment" actually incurred by TNG

(alternatively, the Stati Companies) in connection with construction of the

LPG Plant; and the "management fee" was charged by way of mark-up on

equipment (purportedly) delivered by Perkwood to TNG.

2)   Perkwood was not an operational company. It never had any employees. It

never paid any taxes, salaries, or rent, and it did not incur any other costs

normally incurred by a company that actually carries out business. It did

not provide and could not have provided any management services to

TNG during and/or in connection with the construction of the LPG Plant:

(i) Perkwood filed dormant company accounts for 2006 to 2009, the

period during which the LPG Plant was under construction and when any

services provided in connection therewith would have been rendered; (ii)

no personnel or representatives of Perkwood were present or providing

any services at the site of the LPG Plant during its construction; and (iii)

no contemporaneous documentation corroborates, verifies, or

particularizes the alleged services for which the purported management

fee was purportedly paid, or the basis on which that fee was calculated or

charged.

90.     The true purpose of any purported "management fee" paid (or purportedly paid) by TNG to Perkwood was to inflate the construction costs of the LPG Plant on a fictitious basis.

91.     In proceedings before the English High Court of Justice, Queen's Bench Division, Commercial Court (Cooke, J.), in a decision issued on August 29, 2014 in proceedings related to the Vitol Arbitrations in which Ascom participated and had a full opportunity to prove that the purported "management fee" was a legitimate payment, the English High Court found that the "management fee" was fictitious:

> *Ascom has asserted that it paid a management fee of over $[43] million to an English company called Perkwood. An agreement has been disclosed [the Perkwood Agreement] which makes no mention of any management fee nor of any formula for calculating it. It appears from other evidence that there was a mark up on prices for equipment supplied to the LPG Plant. It appears therefore that this "fee" was simply paid at will.*

[Reasons for Judgment (8/29/2014), *Vitol Group F.S.U. B.V. v. Ascom Grup S.A.*, Case No.: 2014 FOLIO 506, ¶ 39].[1]

92.     In Paragraph 41 of the same decision, the English High Court noted the following regarding the inconsistent positions advanced by Anatolie Stati and certain Stati Companies with respect to various assertions made regarding the LPG Plant:[2]

> *The inconsistency in the position advanced is noteworthy. It is noteworthy also that, in the context of the decision to stop building the LPG Plant, different explanations have been given. The first was that TNG faced financial difficulties; the second that it was intended to sell the plant; the third was that it was feared the Kazakh state might seize it.*

93.     In Paragraph 42 of the same decision, the English High Court made the following further findings regarding certain Stati Companies, including TNG and Perkwood:

---

[1] In this quoted paragraph of the decision, the English High Court references "$33 million" but this is a typographic error, as confirmed by a subsequent paragraph which quotes the correct $43 million figure. *See id.* ¶ 43.

[2] The English High Court refers to the SCC Arbitration as the "ECT Arbitration" in its decision.

*The financial records of the following companies are inaccurate and misleading:*

i)      *Although Perkwood was said to have charged a management fee of over $43 million, it filed dormant company accounts throughout the relevant period.*

ii)     *Although Stadoil and General Affinity [two other Stati Companies] received substantial payments from Montvale [another Stati Company], as set out earlier, their financial statements are inconsistent with this. They are presented as "small companies" with a turnover below £6.5 million.*

iii)    *TNG's audited accounts for the years 2007-2009 do not disclose the fact that Perkwood was a related party.*

iv)     *No mention of the Perkwood management fee is to be found in the ECT Award.*

94.     Further, in Paragraph 43 of the same decision, the English High Court made the following findings regarding Anatolie Stati and his pattern of conduct:

*I am satisfied on the basis of all the material put before me that Mr Stati not only has a propensity to move assets around his group companies as he thinks fit but he and Ascom has a propensity to give information to the tribunal or the court about his assets according to what he or it think suits its interests at the time. Mr Fleuriet is a lawyer who has sworn affidavits on the basis of instructions given to him. His evidence is most unsatisfactory, particularly where it contradicts that given by Mr Lungu or Mr Stati who could be taken to have first hand knowledge of the group assets position and the way in which the group operated. Mr Stati's own evidence is also unsatisfactory. He exhibited Ascom's unaudited accounts for the past 3 years and stated that it did not prepare management accounts at all. It is not apparently a requirement of Moldovan that accounts be audited. ... .*

95.     In Paragraph 44 of the same decision, the English High Court also made the following findings regarding the funds used for construction of the LPG Plant:

*In these circumstances, Vitol's fears about Ascom's financial position, as expressed in its application for security for costs and its fears of dissipation in the context of the current application are well founded. Exactly what Ascom's asset position is remains unclear but the*

*inconsistent information that has been given, when combined with the way in which Mr Stati conducts his business through his companies establishes, in my judgment, a real risk that an award against Ascom could go unsatisfied by reason of unjustifiable disposals of assets or that assets could be dealt with in such a way as to make enforcement more difficult. I cannot accept Mr Fleuriet's assertions that nothing has been done by Ascom save in the ordinary course of business. In Ascom's Reply Submissions in the Fourth Reference, in response to a complaint that sums paid under the TNG COMSA were not used for construction of the LPG Plant, Ascom said that "dollars within the Ascom group were fungible" which is merely another way of saying that assets are moved around the group as Mr. Stati saw fit. Given his approach to Montvale's liabilities in the First Reference, the risk of movement of assets rendering an award against Ascom unenforceable is all too clear.*

### 3.      The Equipment for Construction Fraud

96.      Anatolie Stati, or in the alternative the Statis and/or the Stati Companies, caused TNG to pay, or purport to pay, $72,003,345.00 for (unspecified) equipment that had purportedly been delivered to the construction site of the LPG Plant, but not yet incorporated into the LPG Plant.

97.      This amount could not actually have been paid for such equipment for the following reasons.

98.      Expert evidence produced by Ascom in the Vitol Arbitrations purports to confirm that, according to a TNG accounting database, $72,003,345.00 was purportedly expended on equipment that had been "delivered" to the construction site of the LPG Plant, but not yet incorporated into the LPG Plant as of December 31, 2009. However, by the time the construction of the LPG Plant was abandoned (on or around March 12, 2009), the LPG Plant was approximately 80–90% complete. By October 2008, TGE already had supplied substantially all of the major items of equipment required for the construction of the LPG Plant, which had all been incorporated into the LPG Plant. No significant items of further equipment were required to complete the LPG Plant.

99.     There were (and are) no facilities at or in the vicinity of the LPG Plant suitable for the storage of large amounts of valuable equipment.

100.    TGE had supplied substantially all of the major items of equipment required for the construction of the LPG Plant for the sum of EUR 29.01 million (*i.e.*, U.S. $ 35.05 million). There is therefore no basis on which a further $72,003,345.00 could have been properly expended on further equipment for the construction of the LPG Plant.

101.    It is not possible that $72,003,345.00 was actually expended on further equipment for the construction of the LPG Plant that had not been incorporated into the LPG Plant by December 31, 2009, and the recording of this amount in the TNG accounting database was, upon information and belief, a false entry that artificially inflated the construction costs of the LPG Plant. In the alternative, if $72,003,345.00 was actually expended on further equipment for the construction of the LPG Plant, that expenditure was not made in good faith, but instead to inflate the construction costs of the LPG Plant on a fictitious basis.

## 4.     The Interest Fraud

102.    The Statis and/or the Stati Companies included in TNG's financial statements an element of capitalized interest on the stated LPG Plant construction costs. To the extent the stated LPG construction costs were artificially inflated, as alleged above, the capitalized interest included on such costs was equally inflated.

## F.     Procurement of Falsified Financial Statements

103.    TNG's financial statements for the years ending on December 31, 2007, December 31, 2008, and December 31, 2009 were audited by the accounting firm KPMG. The auditors' reports prepared by KPMG that accompanied those audited financial statements stated

that the financial statements were prepared in accordance with International Financial Reporting

Standards ("IFRS") applicable at the time.

104.    Under the IFRS, International Accounting Standard ("IAS") 24 governs reporting

requirements associated with related party transactions. IAS 24 requires that related party

transactions be disclosed in audited financial statements, and accountants apply heightened

scrutiny to such transactions. IAS 24.1 states:

> *The objective of this standard is to ensure that an entity's financial*
> *statements contain the disclosures necessary to draw attention to the*
> *possibility that its financial position and profit or loss may have been*
> *affected by the existence of related parties and by transactions and*
> *outstanding balances of such parties.*

IAS 24 defines "related party," as, *inter alia*, an entity under common control with another

entity.

105.    Because TNG (and Ascom) are and were at all relevant times controlled by the

Statis, and Perkwood was also at all relevant times under the ultimate ownership and/or control

of the Statis, Perkwood was at all relevant times a "related party" to TNG (and Ascom) within

the meaning of IAS 24.

106.    Pursuant to the requirements of IFRS (and, in particular, IAS 24), all of the

transactions between TNG and Perkwood should therefore have been disclosed as related party

transactions, and TNG's financial statements should have provided all of the information that

was "necessary for an understanding of the potential effect of the relationship [between TNG and

Perkwood] on the financial statements[.]"

107.    In violation of these standards, TNG's audited financial statements for the years

ending December 31, 2007, December 31, 2008, and December 31, 2009 (i) failed to disclose

that Perkwood was a related party to TNG; (ii) failed to disclose that any transactions between

Perkwood and TNG were accordingly related party transactions; and (iii) failed to disclose any of the information that should have been disclosed pursuant to IAS 24 in relation to those transactions.

108.    Instead of disclosing that information about Perkwood, TNG's audited financial statements for the year ending December 31, 2007 made certain disclosures regarding related party transactions, including that "A significant proportion of the Company's business is conducted through transactions with related parties and the effect of these, on the basis determined between the related parties is reflected below," and stated that the (only) related parties with whom TNG had conducted transactions during the relevant time period were (i) Ascom; (ii) Arpega Trading; (iii) General Affinity; (iv) KASKO; (v) KASKo-Petrostar; (vi) KPM; and (vii) Tristan.

109.    Similarly, TNG's audited financial statements for 2008 stated, "Related parties are entities with common or direct or indirect shareholders, directors, or management. A significant portion of the Company's business is conducted through transactions with related parties and the effect of these, on the basis determined between the related parties is reflected below," and stated that the (only) related parties with whom TNG had conducted transactions during the relevant time period were (i) Ascom; (ii) Arpega Trading; (iii) General Affinity; (iv) KASKO; (v) KASKo-Petrostar; (vi) KPM; and (vii) Tristan.

110.    TNG's audited financial statements for 2009 contained wording regarding related party transactions that was identical to the audited financial statements for 2008 quoted above, and stated that the (only) related parties with whom TNG had conducted transactions during the relevant period were (i) Ascom; (ii) Arpega Trading; (iii) General Affinity; (iv) KASKO; (v) KASKO-Petrostar; (vi) KPM; and (vii) Tristan.

111.    On information and belief, the failure to make any of the disclosures regarding Perkwood in TNG's audited financial statements for the years ending December 31, 2007, December 31, 2008, and December 31, 2009 did not result from an inadvertent error (whether by TNG's management or by KPMG), but instead, from the deliberate concealment of Perkwood's status as a related party to TNG within the meaning of IAS 24 from KPMG, on behalf of and/or at the ultimate direction of Anatolie Stati, alternatively the Statis and/or the Stati Companies.

112.    As a result of the failure to disclose that Perkwood was a related party, Anatolie Stati, or in the alternative the Statis and/or the Stati Companies, obtained falsified financial statements bearing the blessing of a major international accounting firm.

**G.    False Representation of Construction Costs of the LPG Plant in Audited Financial Statements**

113.    In addition to failing to disclose Perkwood as a related party, TNG's audited financial statements for the years ending December 31, 2007, December 31, 2008, and December 31, 2009 also contained false and misleading information about the construction costs incurred by TNG for the LPG Plant by claiming that the amounts charged by Perkwood pursuant to the Perkwood Agreement were legitimate. Specifically:

1)      TNG's audited financial statements for the year ending December 31, 2007 stated that the construction costs that had been incurred by TNG for the LPG Plant were $142,530,039.00.

2)      TNG's audited financial statements for the year ending December 31, 2008 stated that the construction costs that had been incurred by TNG for the LPG Plant were $223,165,685.00.

3)      TNG's audited financial statements for the year ending December 31,
2009 stated that the construction costs that had been incurred by TNG for
the LPG Plant were $248,084,113.00.

114.    These representations were false, and known by Defendants to be false, because,
as alleged above, Anatolie Stati, or in the alternative the Statis and/or the Stati Companies,
artificially inflated the costs of the LPG Plant through schemes that included (but may not have
been limited to) the Repurchase and Fictitious Parts Fraud, the Management Fee Fraud, the
Equipment for Construction Fraud, and the Interest Fraud, as alleged above.

115.    Statements contained in TNG's unaudited interim financial statements and in the
unaudited interim combined financial statements for KPM, TNG, and Tristan — which all stated
that they had been prepared in accordance with IFRS — concerning the construction costs for the
LPG Plant were also false because they were fictitiously inflated in the same manner as the
corresponding statements in TNG's audited financial statements. Specifically, (i) TNG's
unaudited interim financial statements for the six months ending June 2007 stated that the
constructions costs incurred by TNG for the LPG Plant as of June 30, 2007 were
$14,626,766.00; and (ii) TNG's unaudited interim financial statements for the six months ending
June 2008 stated that the construction costs that had been incurred by TNG for the LPG Plant as
of June 30, 2008 were $192,969,994.00.

**H.      Falsified Financial Statements are Used to Obtain Bids for Purchase of the
         LPG Plant**

116.    The Statis continued their fraudulent scheme when they attempted to sell certain
of their Kazakh assets, including the LPG Plant, through a bidding process (the "2008 Sales
Process"), named "Project Zenith."

### 1.      The Teaser Contained False and Misleading Information

117.      The Statis caused Ascom and Terra Raf (as the selling shareholders of KPM and

TNG) to retain Renaissance Securities (Cyprus) Limited and Renaissance Capital Central Asia

JSC (together, "Renaissance Capital") as the financial advisor for Project Zenith.

118.      Renaissance Capital distributed a "teaser" offer (the "Teaser") to 129 potential

purchasers. The Teaser was dated July 18, 2008. The prospective purchasers included

companies located in the United States, Europe, the Middle East, Russia, Asia and Kazakhstan.

The Teaser stated at page 2 that the information contained therein was "assembled" by the

"management" of Tristan, TNG and KPM with the assistance of Renaissance Capital, and was

"believed to be accurate and reliable." The Teaser stated at page 8 that the Statis, through TNG,

expected to spend $230 million on capital expenditures on the LPG Plant, and had already spent

$160 million to date. For the reasons alleged above, these statements regarding actual and

anticipated capital expenditures on the LPG Plant were false and misleading.

### 2.      The Information Memorandum Contained False and Misleading Information

119.      For those who responded to the Teaser, the Statis caused Renaissance Capital to

distribute an "Information Memorandum," dated August 2008, which contained further

information about KPM and TNG. The stated "sole purpose" of the Information Memorandum

was to "assist" potential purchasers in "evaluating" the Statis' assets in Kazakhstan, *i.e.*, KPM

and TNG.

120.      The Information Memorandum stated that the information contained therein was

"assembled by the management of the Companies" [*i.e*., KPM and TNG] with the assistance of

Renaissance Capital, and was "believed to be accurate and reliable."

Case 1:17-cv-02067-ABJ   Document 1   Filed 10/05/17   Page 37 of 97

121.    The Information Memorandum included key financial information regarding the various assets offered for sale, including the LPG Plant. As stated in the Information Memorandum, this financial information was derived from (i) the unaudited interim combined balance sheets and statements of income, cash flows, and changes in shareholders' equity of KPM, TNG, and Tristan as of and for the six months ending June 30, 2007 and 2008, and the audited combined balance sheets and statements of income, cash flows, and changes in shareholders' equity of KPM, TNG, and (with effect from its incorporation on October 24, 2006) Tristan, as of December 31, 2005, 2006, and 2007; and (ii) the individual interim unaudited balance sheets and statements of income, cash flows, and changes in shareholders' equity of each of KPM, TNG, and Tristan, as of and for the six months ending June 30, 2007 and 2008, and the individual audited individual balance sheets and statements of income, cash flows, and changes in shareholders' equity of KPM, TNG, and (with effect from its incorporation on October 24, 2006) Tristan, as of December 31, 2005, 2006, and 2007.

122.    Further, the Information Memorandum falsely represented, for the reasons alleged above, that the financial statements from which the financial information in the Information Memorandum had been derived had been prepared in accordance with IFRS:

> *The Companies' and Tristan Oil's financial statements have been prepared in accordance with International Financial Reporting standards ('IFRS'). Prior to 01 January 2007, the combined and individual financial statements of Tristan Oil, KPM and TNG were audited by Deloitte. Following the best practice to change auditors periodically, the Companies and Tristan Oil changed to KPMG as auditor for the year ended 31 December 2007 and thereafter.*

123.    The Information Memorandum identified companies involved in and responsible for the construction of the LPG Plant without any mention of Perkwood:  "The project's design engineer is Petrostar (Romania); the key supplier of equipment is Tractebel Gas Engineering

(Germany) [*i.e.*, TGE]. The design is being adapted to local Kazakh requirements by KASKo Petrostar, a related party of the Companies."

124.    In reliance on TNG's falsified financial statements and other false information provided by Anatolie Stati, or in the alternative the Statis and/or the Stati Companies, the Information Memorandum included false representations regarding the costs of constructing the LPG Plant. Specifically, the Information Memorandum stated that "[t]he LPG [P]lant is expected to be commissioned in the second quarter of 2009 with total CAPEX requirement of US$233 million," and that "[a]s of 1 July 2008, TNG had spent approximately $193 million on the LPG [P]lant." For the reasons alleged above, these representation were false and misleading.

125.    The Information Memorandum provided a financial overview of Tristan, KPM and TNG, and described the Notes issued by Tristan pursuant to the Indenture. The Information Memorandum specifically highlighted the Indenture's covenant limiting the ability of Tristan, KPM and TNG to enter into related party transactions unless requisite approvals and/or opinions were obtained. This representation was false and/or misleading because of the failure of Anatolie Stati, or in the alternative the Statis and/or the Stati Companies, to disclose Perkwood as a related party.

### 3.    The KPMG Report Contained False and Misleading Information

126.    Anatolie Stati, or in the alternative the Statis and/or the Stati Companies, also retained KPMG to perform vendor and financial due diligence in connection with the 2008 Sales Process. KPMG issued a Vendor Due Diligence report (the "KPMG Report") on the combined businesses of Tristan, KPM and TNG (referred to in the KPMG Report as the "Group") dated August 29, 2008. The "primary source" for the data in the KPMG Report (p. 1)

was information and representations made to KPMG by Anatolie Stati, or in the alternative the Statis and/or the Stati Companies.

127.     The KPMG Report (pp. 1, 125) stated that the contents of the report had been reviewed in detail by the directors of Tristan, KPM and TNG, who confirmed the factual accuracy of the report in writing and represented that there were no material facts or information omitted from the Report that "may cause the view it gives of the Tristan Oil Group to be misleading." As set forth below, this representation was false.

128.     The KPMG Report included false representations regarding Perkwood's status as an independent third party. One of the Report's key areas of analysis was related party transactions. In this respect, KPMG's stated scope of work (pp. 6, 116) was to:  "Identify significant related party transactions, enquire into their rationale, the underlying terms and nature of such transactions; [e]nquire if these transactions have been at arms' length and assess the financial impact and related risks; and [c]omment on the impact of discontinuing related party transactions on the business of the target companies." KPMG was not able to effectively carry out this scope of work because Anatolie Stati, or in the alternative the Statis and/or the Stati Companies, failed to disclose that Perkwood was a related party. While the KPMG Report (pp. 11, 15) stated that "the Group's operations are highly dependent on related parties," and disclosed the related parties with whom KPM and TNG contracted, the Report did not state that Perkwood was a related third party. Instead, KPMG's Report (pp. 11, 72) represented that Perkwood — which was reported as TNG's largest supplier — was an independent third party.

129.     The KPMG Report also included false representations regarding the construction costs of the LPG Plant. The Report (pp. 9, 86) represented that the total cost of the LPG Plant was estimated to be $233 million, of which $193 million had been invested as of June 30, 2008,

and an additional $40 million was projected to be invested. For the reasons alleged above, this representation was false.

> **4.    KMG Submits Bid Based on the False and Misleading Information in the Teaser Offer, the Information Memorandum and the KPMG Report**

130.    KazMunaiGas ("KMG"), the state-owned oil and gas company of Kazakhstan, was one of the eight (8) prospective purchasers who submitted a bid on the Kazakh assets of Anatolie Stati, or in the alternative the Statis and/or the Stati Companies.

131.    KMG's September 25, 2008 offer (the "Indicative Offer"), which estimated the value of the LPG Plant to be $199 million, directly relied on the false and misleading information provided by Anatolie Stati, or in the alternative the Statis and/or the Stati Companies, in the 2008 Sales Process.

132.    The Indicative Offer stated that:

> 1)    in formulating its bid, KMG had "relied upon the information contained in the Information Memorandum" (as well as other information), and that its valuation "depends upon this information and assumptions being substantiated in the next round through due diligence materials and meetings";
>
> 2)    in valuing the LPG Plant, KMG had placed particular reliance on the $193 million figure that KMG understood from the Information Memorandum and its underlying sources to represent the construction costs of the LPG Plant incurred to that date; and
>
> 3)    the method by which KMG had ascribed a value to the LPG Plant was by taking the arithmetical average of (i) comparative method value and

(ii) cost method value, with the $193 million construction costs figure

from the Information Memorandum and its underlying sources being used

for the latter.

133.    Both the terms and the fact of the KMG Indicative Offer were thus procured by

fraud, because Defendants knew that the bid was expressly submitted in reliance on information

that Defendants knew to be false (*i.e.* the fictitiously-inflated construction costs of the LPG

Plant and the concealed related-party status of Perkwood, as alleged above).

134.    If KMG had instead been provided with the true (and necessarily lower)

construction costs of the LPG Plant, then — because the KMG Indicative Offer carried the

construction costs into an arithmetical average — the value ascribed to the LPG Plant in the

KMG Indicative Offer would have been lower. Every dollar of overstated construction costs, as

reported in the falsified financial statements and in the Information Memorandum, increased

KMG's Indicative Offer by fifty (50) cents.

## II.    THE SCC AWARD WAS OBTAINED BY FRAUD

### A.    Defendants Institute Arbitral Proceedings Against Kazakhstan

135.    In 2008 and 2009, KPM and TNG curtailed the expenses necessary for the

continued development of their oil and gas projects in Kazakhstan, and abandoned work on the

LPG Plant in March 2009. The LPG Plant was never completed.

136.    On July 21, 2010, the Kazakh Ministry of Oil and Gas terminated KPM's and

TNG's Subsoil Use Contracts.

137.    Five (5) days later, on July 26, 2010, Defendants filed a Request for Arbitration

with the SCC, claiming that Kazakhstan's actions violated various provisions of the ECT.

138.     In the SCC Arbitration, Defendants contended that as a result of Kazakhstan's alleged breaches of the ECT, Defendants were entitled to damages for, *inter alia,* (i) their actual investment in the LPG Plant, which they claimed was approximately $245 million; and (ii) the additional profit that they contended would have been realized from the LPG Plant but for Kazakhstan's alleged breaches of the ECT, which Defendants asserted was $84,077,000.00.

**B.      In Furtherance of their Fraudulent Scheme, Defendants Present False Testimony and Evidence to the SCC Tribunal**

139.     Defendants were represented in the SCC Arbitration by the law firm of King & Spalding. Specifically, they were represented by *inter alia* Reginald R. Smith and Kevin Mohr of King & Spalding's Houston office, as well as Heloise Herve, Kenneth Fleuriet, and Amy Roebuck Frey of King & Spalding's Paris Office.

140.     During the SCC Arbitration, the quantum of damages for the LPG Plant was strongly contested. Defendants contended that the LPG Plant should be valued on an investment cost basis, while Kazakhstan contended that it should be valued as scrap, given that the LPG Plant was never completed and was not a viable investment (based on expected future cash flows).

141.     Defendants deliberately misled the SCC Tribunal regarding the amount of the investment in the LPG Plant, repeatedly representing (and relying on evidence to the effect) that they had invested over $245 million in the development and construction of the LPG Plant. For example:

> 1)      Defendants' Statement of Claim dated May 18, 2011 stated that they "invested more than USD 245 million in development and construction of the LPG plant."

2)    The first witness statement of Artur Lungu, dated May 17, 2011, asserted that "When the State seized KPM and TNG and all of their assets, including the LPG Plant, in July of 2010, more than USD 245 million had been invested in construction of the LPG Plant … ." Mr. Lungu was Ascom's Chief Financial Officer and Tristan's Executive Vice President and Chief Financial Officer.

3)    The expert report of FTI dated May 17, 2011 noted that "[p]er the audited financial statements for the period ended 31 December 2009, TNG has invested approximately $245 million in the design and construction of the LPG Plant," and that "[a]s of 30 September 2008, TNG reported $208.5 million related to total capital costs invested into the LPG Plant."

4)    Defendants' Reply Memorial on Jurisdiction and Liability dated May 7, 2012 stated that "in May of 2009, Claimants ceased their capital outlays for construction of the LPG Plant, having already invested more than US $245 million in its construction."

5)    The second witness statement of Anatolie Stati dated May 7, 2012 stated that "Faced with this climate of fear and uncertainty, I [*i.e.* Anatolie Stati] chose in May of 2009 to postpone the LPG Plant project, having already spent more than USD 245 million toward its construction."

6)    The supplemental expert report of FTI dated May 28, 2012 stated that the "Total investment that the Claimants have invested in the LPG Plant is $245 million," and that the "Total investment for [*sic*] which the Claimants have invested in the LPG Plant is [US]$245 million"

7)      Defendants' Reply Memorial on Quantum dated May 28, 2012 reiterated

that "In the event the Tribunal chooses not to award the prospective value

of the LPG Plant, Claimants request an award of the investment value of

the LPG Plant, as adjusted by FTI to account for the approximately US

$37 million in additional expenditures by Claimants through May, 2009,

in the sum of US $245 million."

8)      In oral evidence at a hearing in the arbitration on October 2, 2012,

Anatolie Stati repeated the statement made in his second witness statement

as pled in subsection (5) above.

9)      In oral evidence at a hearing in the arbitration on January 28, 2013, Mr.

Lungu repeated the statement made in his first witness statement as pled in

subsection (2) above.

10)     Defendants' First Post-Hearing Brief dated April 8, 2013 stated that

"Claimants invested more than US $240 million in construction of the

LPG plant," that the investment cost of the LPG Plant was "US

$245,000,000," and that they were claiming their investment cost of "US

$245,000,000" for the LPG Plant.

11)     Defendants' Second Post-Hearing Brief dated June 3, 2013 stated that

"TNG's audited 2009 financial statements … list the net book value of the

LPG Plant as US $248 million at December 31, 2009, which corroborates

FTI's assessment of US $245 million. Data from the Claimants' historical

financial records, particularly data from audited financial statements, is

perfectly reliable evidence, and is not simply FTI parroting the

Claimants," that "the Tribunal should award damages for the LPG Plant

based on: (1) Claimants' out-of-pocket investment costs of US $245

million," and that they were claiming their investment cost of "US

$245,000,000" for the LPG Plant.

142.    The investment cost of the LPG Plant was not $245,000,000.

143.    Defendants invested substantially less than $245,000,000 in construction of the

LPG Plant.

144.    Each of the statements pleaded in paragraph 141 was false, because the stated

construction costs did not represent the true construction costs that had been actually incurred in

connection with the construction of the LPG Plant. Instead, as alleged above, the stated

construction costs had been fictitiously inflated through schemes that included (but may not have

been limited to) the Repurchase Fraud and the Fictitious Parts Fraud, the Management Fee

Fraud, the Equipment for Construction Fraud, and the Interest Fraud.

145.    Defendants also deliberately and dishonestly violated a Document Production

Order to conceal the existence of the Perkwood Agreement from, and thereby to mislead, both

Kazakhstan and the SCC Tribunal.

146.    By the Document Production Order dated February 3, 2012, the SCC Tribunal

ordered Defendants to disclose to Kazakhstan, *inter alia*, documents in their possession, custody,

or control "specifying the cost of construction and assembly operations, start-up and adjustment

works in respect of basic facilities of the [LPG] [P]lant."

147.    The Perkwood Agreement fell directly within the scope of, and should have been

disclosed by Defendants pursuant to, the February 3, 2012 Document Production Order, because

Defendants' position in the SCC Arbitration was that the genuine, *bona fide* construction costs of

the LPG Plant included the sums that had been paid to Perkwood (including pursuant to the Perkwood Agreement). However, in breach of the February 3, 2012 Document Production Order, Defendants failed to disclose the Perkwood Agreement in the SCC Arbitration.

148.   On information and belief, Defendants' failure to disclose the Perkwood Agreement pursuant to the February 3, 2012 Document Production Order was deliberately designed (i) to prevent Kazakhstan from uncovering, and to conceal evidence that could reveal, Defendants' fictitious inflation of the construction costs of the LPG Plant in general, and (at least) each of the Repurchase Fraud and the Fictitious Parts Fraud, the Management Fee Fraud, the Equipment for Construction Fraud, and the Interest Fraud in particular; and (ii) thereby to facilitate Defendants' deliberate and knowing misleading of the SCC Tribunal as to the construction costs of the LPG Plant (and, consequently, the value of the LPG Plant).

149.   Defendants also repeatedly represented to the SCC Tribunal that the KMG Indicative Offer was, and could be relied upon as, a reliable indication of the market value of the LPG Plant.

150.   Defendants made the following representations to the SCC Tribunal:

1)   Defendants' Statement of Claim dated May 18, 2011 referred to the KMG Indicative Offer, stating that "The non-binding indicative offers [*i.e.* including the KMG Indicative Offer] … provide a record of the actual reaction of willing and able buyers to an offer of the properties by a willing and able seller, with each acting at arms' length in an open and unrestricted market, without compulsion to buy or sell, and each having knowledge of the relevant facts," and relied again on the KMG Indicative Offer as comprising part of "a factual record of the actual reaction of

willing and able buyers to an offer of a portion of Claimants' investments by a willing and able seller, with each acting at arms-length in an open and unrestricted market, without compulsion to buy or sell, and each having reasonable knowledge of the relevant facts."

2)    Defendants' Reply Memorial on Jurisdiction and Liability dated May 7, 2012 twice referred to the KMG Indicative Offer, once again representing that it comprised a relevant (if conservative) guide to the value of its subject matter.

3)    Defendants' Reply Memorial on Quantum dated May 28, 2012 invited the Tribunal to consider the KMG Indicative Offer in the following terms: "Indeed, the offer made for the LPG Plant by [KMG] at that time was US $199 million. While Claimants did not accept these offers because at the time they deemed them too low and did not feel that they would lead to a sale, the Tribunal should note that State-owned [KMG] itself offered almost US $200 million for the [LPG] Plant, more than six times the highest value assigned to the LPG Plant by Deloitte of US $32 million. Little more is needed to demonstrate that Deloitte's salvage value assumptions and calculations are worthless."

4)    Defendants' First Post-Hearing Brief dated April 8, 2013 again referred on multiple occasions to the KMG Indicative Offer, directly or indirectly, on each occasion representing that it comprised a relevant (if conservative) guide to the value of its subject matter.

5)      At a hearing on quantum in the SCC Arbitration on January 28, 2013, Defendants submitted that damages should, at a minimum, be awarded in the amount of the KMG Indicative Offer, again representing that it comprised a relevant guide to the value of its subject matter.

151.    Each of the statements pleaded in paragraph 150 was false because (i) Defendants knew that the KMG Indicative Offer had been procured by fraud; and (ii) Defendants knew that the KMG Indicative Offer was not, and could not be regarded as, a reliable indicator of the market value of the LPG Plant.

152.    Defendants used the following false evidence during the SCC Arbitration:

1)      the fraudulently procured bids from the 2008 Sales Process;

2)      the falsified financial statements of KPM, TNG, and Tristan;

3)      false testimony regarding the amount of investment in the LPG Plant; and

4)      expert reports which relied on categories (1) through (3).

153.    Defendants submitted expert reports to the SCC Tribunal that relied on the fraudulently procured bids in the 2008 Sales Process; the falsified financial statements of KPM, TNG, and Tristan; and the false testimony of Anatolie Stati and Mr. Lungu. As a result, Defendants obtained false expert evidence concerning the valuation of the LPG Plant.

154.    Certain of Defendants' experts were located in the United States. Defendants retained Howard Rosen and Laura R. Hardin of FTI Consulting, Inc. ("FTI") to assess Defendants' economic damages related to their Kazakh assets, including the LPG Plant. FTI submitted an initial report dated May 17, 2011; a supplemental report dated May 28, 2012; amendments to the supplemental report dated January 25, 2013; a third expert report dated April 8, 2013 (authored by Howard Rosen only); and a post-hearing report dated June 3, 2013

(authored by Howard Rosen only). Upon information and belief, Ms. Hardin was located in Houston, Texas when she prepared all or a portion of FTI's expert reports and/or submissions.

155.    FTI's May 28, 2012 supplemental expert report relied on two categories of false information. First, in Paragraph 7.5, it cited the bids on the LPG Plant procured through the 2008 Sales Process, including KMG's $199 million Indicative Offer, to demonstrate that the value of the LPG Plant was "well in excess of its salvage value":

> *Offers made by interested buyers in 2008 for buying Claimants' assets as summarized on page 106 of our previous report, valued the LPG Plant at $150 million on average. The offer made by state-owned KazMunaiGaz at that time was $199 million for the LPG Plant. Hence it is clear that the value of the LPG Plant at the 2008 Valuation Date was well in excess of its salvage value.*

For the reasons alleged above, the bids solicited through the 2008 Sales Process, including the KMG Indicative Offer, were predicated on the false and misleading information of Defendants in the Teaser, Information Memorandum, and KPMG Report.

156.    Second, FTI's supplemental report relied on the false representations in Tristan's financial statements and annual reports when assessing the investment value of the LPG Plant. Specifically, Tristan's September 30, 2008 financial statements falsely represented that Defendants invested $208.5 million in the LPG Plant, and Tristan's 2009 Annual Report falsely represented that Defendants invested $245 million in the LPG Plant. FTI's supplemental report (¶¶ 7.10, 9.3) expressly relied on these false representations in concluding that the value of Defendants' total investment in the LPG Plant was $245 million.

157.    At no point did Defendants disclose to the SCC Tribunal that the financial statements were falsified and fraudulent. Instead, during the SCC Arbitration, Defendants affirmatively relied on the falsified financial statements to support their claims. For example, in their Second Post-Hearing Brief (¶ 354), Defendants defended criticisms of FTI's assessment of

the investment value of the LPG Plant on the basis that the financial statements and annual reports were "prepared for investors in the ordinary course of business, and not for the purposes of litigation." In the same document, Defendants also falsely represented to the SCC Tribunal and Kazakhstan that their "historical financial records, particularly data from audited financial statements," was "perfectly reliable evidence."

### C.     The SCC Tribunal Awards Damages On the Basis of the Fraudulently Procured and Presented KMG Indicative Offer

158.     On December 19, 2013, the SCC Tribunal issued an award in favor of Defendants in the amount of $497,685,101.00, plus $8,975,496.40 in costs.

159.     The SCC Tribunal found Kazakhstan to be in breach of the ECT's standard of fair and equitable treatment. The SCC Tribunal awarded the following damages to Defendants: (i) $277.8 million for two oil and gas fields; (ii) $31.3 million for another contract area; and (iii) $199 million for the LPG Plant. After deducting $10,444,899.00 in debts, the SCC Tribunal issued the final award in the amount of $497,685,101.00.

160.     Defendants' fraudulent scheme affected the SCC Tribunal's determinations on jurisdiction, liability and quantum.

161.     Defendants' fraudulent scheme and false evidence affected the outcome of the SCC Arbitration, since they affected the SCC Tribunal's assessments of the questions of: (i) the Tribunal's jurisdiction; (ii) Kazakhstan's potential liability for damages; and (iii) the quantum of damages awarded by the Tribunal.

162.     Defendants argued that the SCC Tribunal should use the KMG Indicative Offer to value the LPG Plant. In the Award (¶ 1696), the SCC Tribunal quotes Defendants' Reply Memorial on Quantum as arguing that "the Tribunal should note that State-owned KazMunaiGas itself offered almost US $200 million for the Plant, more than six times the highest value

assigned to the LPG Plant by Deloitte [Kazakhstan's expert] of US $32 million. Little more is needed to demonstrate" the value of the LPG Plant.

163.    The SCC Tribunal ultimately decided to base its assessment of the valuation of the LPG Plant ($199 million) on the KMG Indicative Offer that Anatolie Stati, or in the alternative the Statis and/or the Stati Companies, had falsely and fraudulently obtained. The SCC Tribunal stated in the Award (¶ 1747) that it "consider[ed] it to be of particular relevance that an offer was made for the LPG Plant by state-owned KMG at that time for USD 199 million," and "consider[ed] that to be the relatively best source of information for the valuation of the LPG Plant[.]" "Therefore," the Tribunal concluded in Paragraph 1748 of the Award, "that is the amount of damages the Tribunal accepts in this context."

164.    Kazakhstan was not aware of Defendants' fraudulent scheme at the time of the SCC Arbitration, and thus was not able to present evidence of it to the SCC Tribunal. Specifically, Kazakhstan was not able to present to the Tribunal that the KMG Indicative Offer was fraudulently obtained because it explicitly relied upon the Information Memorandum, which contained materially false information because it, in turn, relied upon the falsified financial statements of KPM, TNG, and Tristan, which concealed the related party status of Perkwood and misrepresented the actual construction costs of the LPG Plant.

165.    In the SCC Arbitration, Defendants did not disclose that Perkwood was a Stati Company. Kazakhstan only learned this after the production of documents related to the Vitol Arbitrations pursuant to the New York § 1782 Proceedings, as alleged below. Further, Kazakhstan for the first time obtained a copy of the Perkwood Agreement as a result of the New York § 1782 Proceedings.

166.    In the SCC Arbitration, the Tribunal required Defendants to disclose "documents specifying the cost of construction and assembly operations, start-up and adjustment works in respect of basic facilities of [the LPG Plant]." Despite this, Defendants did not disclose the Perkwood Agreement for construction of the LPG Plant in the SCC Arbitration.

167.    In the SCC Arbitration, Defendants knowingly submitted pleadings, briefs, witness statements and other evidence in furtherance of Defendants' fraudulent scheme and/or to unjustly enrich themselves. These pleadings and/or briefs and/or witness statements were sent through the United States mails, private or commercial interstate carriers, and/or interstate wires in furtherance of Defendants' fraudulent scheme and/or to unjustly enrich themselves. Each mailing or wiring of a pleading, brief, witness statement and/or other evidence in furtherance of the fraudulent scheme is a violation of the federal mail fraud statute, 18 U.S.C. § 1341, or the federal wire fraud statute, 18 U.S.C. § 1343, and is an independent predicate act under 18 U.S.C. § 1961.

168.    On information and belief, in relation to the SCC Arbitration, Defendants sent other communications through the United States mails, private or commercial interstate carriers, and/or interstate wires in furtherance of Defendants' fraudulent scheme and/or to unjustly enrich themselves. These other communications, on information and belief, included but are not limited to communications with Defendants' counsel in the United States. Each mailing or wiring of a communication in furtherance of the fraudulent scheme is a violation of the federal mail fraud statute, 18 U.S.C. § 1341, or the federal wire fraud statute, 18 U.S.C. § 1343, and is an independent predicate act under 18 U.S.C. § 1961.

169.    On information and belief, Defendants made payments to their United States counsel from a place outside the United States for counsel's services related to the SCC

Arbitration in furtherance of Defendants' fraudulent scheme and/or to unjustly enrich themselves. Each such payment is a violation of the federal money laundering statute, 18 U.S.C. § 1956(a)(2)(A) & (B)(i), and is an independent predicate act under 18 U.S.C. § 1961.

## III.    KAZAKHSTAN BEGINS TO UNRAVEL THE FRAUDULENT SCHEME

170.    Defendants and/or other Stati Companies were also participants in three other arbitration proceedings in which valuation of the LPG Plant was at issue — the Vitol Arbitrations. These were three other arbitrations all involving, on one side, Defendants, and, on the other side, companies associated with the Vitol Group of companies. The Vitol Group of companies was represented in the Vitol Arbitrations by the law firm of Clyde & Co, while Defendants were represented by King & Spalding in two of the three arbitrations.

171.    After the SCC Arbitration concluded, the Statis and Stati Companies sought to enforce the awards from the Vitol Arbitrations in Kazakh courts.

172.    Kazakhstan learned of these enforcement proceedings, and requested information concerning the Vitol Arbitrations from Clyde & Co. Defendants threatened Vitol and its counsel with legal action in the event that Clyde & Co. voluntarily produced any information to Kazakhstan.

173.    On March 27, 2015, Kazakhstan filed the New York § 1782 Proceedings requesting court permission to issue a subpoena to Clyde & Co. to compel production of the documents that Defendants had prevented Clyde & Co. from disclosing.

174.    On March 30, 2015, the U.S. District Court for the Southern District of New York granted Kazakhstan the requested permission, and on April 1, 2015, Kazakhstan served the subpoena on Clyde & Co.

175.     On April 10, 2015, Defendants, in furtherance of their fraudulent scheme, intervened in the New York § 1782 Proceedings and moved to quash Kazakhstan's subpoena. Defendants were represented by James E. Berger and Charlene C. Sun of King & Spalding's New York office.

176.     On June 22, 2015, after full briefing and oral argument, the U.S. District Court for the Southern District of New York rejected Defendants' arguments, thus permitting Clyde & Co. to comply with Kazakhstan's subpoena.

177.     In late June 2015, Clyde & Co. began a rolling production of documents to Kazakhstan, which continued through approximately August 2015.

178.     The documents produced by Clyde & Co., combined with other efforts by Kazakhstan that are still ongoing, revealed Defendants' fraudulent scheme. Specifically, Clyde & Co. produced the October 10, 2013 witness statement of Mr. Lungu in the arbitration between Ascom and Vitol FSU. In that witness statement, Mr. Lungu disclosed that Perkwood was an "affiliate" of Ascom. This was the first time that Kazakhstan learned that Perkwood was a Stati Company.

179.     Defendants knowingly submitted pleadings and/or briefs in the New York §1782 Proceedings in furtherance of their fraudulent scheme and/or to unjustly enrich themselves. The pleadings and/or briefs were sent through the United States mails, private or commercial interstate carriers, and/or interstate wires in furtherance of Defendants' fraudulent scheme and/or to unjustly enrich Defendants. Each mailing or wiring of a pleading and/or brief is a violation of the federal mail fraud statute, 18 U.S.C. § 1341, or the federal wire fraud statute, 18 U.S.C. § 1343, and is an independent predicate act under 18 U.S.C. § 1961.

180.   On information and belief, in relation to the New York § 1782 Proceedings, Defendants sent other communications through the United States mails, private or commercial interstate carriers, and/or interstate wires in furtherance of Defendants' fraudulent scheme and/or to unjustly enrich themselves. These other communications, on information and belief, included but are not limited to communications with Defendants' counsel in the United States. Each mailing or wiring of a communication in furtherance of the fraudulent scheme is a violation of the federal mail fraud statute, 18 U.S.C. § 1341, or the federal wire fraud statute, 18 U.S.C. § 1343, and is an independent predicate act under 18 U.S.C. § 1961.

181.   On information and belief, Defendants made payments to their United States counsel from a place outside the United States for counsel's services related to the New York § 1782 Proceedings in furtherance of Defendants' fraudulent scheme and/or to unjustly enrich themselves. Each such payment is a violation of the federal money laundering statute, 18 U.S.C. § 1956(a)(2)(A) & (B)(i), and is an independent predicate act under 18 U.S.C. § 1961.

## IV.   DEFENDANTS RESIST ANNULMENT OF THE FRAUDULENTLY PROCURED SCC AWARD

182.   At the time Kazakhstan began to unravel the fraudulent scheme in August 2015, proceedings in Sweden (as well as the United States and England) were pending regarding the annulment and/or enforcement of the SCC Award.

183.   On March 19, 2014, Kazakhstan instituted a proceeding before the Svea Court of Appeal in Stockholm, Sweden to set-aside the SCC Award under the Swedish Arbitration Act, captioned *Republic of Kazakhstan v. Ascom Group S.A., et al.*, Case No. T 2675-14 ("Swedish Annulment Proceedings").

184.   In the Swedish Annulment Proceedings, Defendants' counsel of record was the Lindahl law firm. However, in Defendants' costs submission in these proceedings, Defendants

claimed approximately $1.1 million in compensation for legal work conducted in these proceedings by Reginald R. Smith and Kevin Mohr of King & Spalding's Houston office, as well as Kenneth Fleuriet of King & Spalding's Paris Office and Egishe Dzhazoyan of King & Spalding's London office. According to Defendants' costs submission, these individuals assisted Defendants during the entire Swedish Annulment Proceedings. In comparison, the Lindahl law firm claimed approximately $1.9 million in compensation.

185.     At the time Kazakhstan initiated the Swedish Annulment Proceedings, it did not have knowledge of Defendants' fraudulent scheme. After Kazakhstan began to unravel the scheme, Kazakhstan filed a motion in the Swedish Annulment Proceedings on October 5, 2015 asserting that the SCC Award was invalid because it was contrary to Swedish public policy. Kazakhstan argued *inter alia* that Defendants' fraud affected the arbitration process with respect to jurisdiction, liability, and damages.

186.     With respect to jurisdiction, Kazakhstan asserted that an action under the ECT requires a good-faith investment and that Defendants' investment was the product of their illegal conduct. With respect to liability, Kazakhstan asserted that Defendants' credibility was critical to their case and the SCC Tribunal's ruling in their favor; had the SCC Tribunal known that Defendants were engaged in fraud, the outcome of the case would have been different. With respect to damages, Kazakhstan noted that Defendants, in claiming damages, had falsely testified that they had incurred $245 million in costs when constructing the LPG Plant, failed to disclose that Perkwood was a related party, and relied on the fraudulently-obtained Indicative Offer.

187.     In response, Defendants did not offer any evidence to contradict the key elements of the fraudulent scheme. With respect to Perkwood, Defendants initially denied that it was a related party. Subsequently, however, when confronted with contrary evidence produced by

Kazakhstan, Defendants conceded that Perkwood was a related party during Kazakhstan's opening statement on the first day of the hearing.

188.     Despite Kazakhstan's detailed and specific allegations regarding Defendants' fraudulent scheme, on December 9, 2016, the Svea Court of Appeal dismissed its claim to annul the SCC Award. Firstly, the Court held that the false evidence and testimony as to $245 million in LPG Plant construction costs, even if accepted as true, did not require annulment of the SCC Award under Swedish law because the Court held that this evidence did not affect the SCC Tribunal's determination of the amount of damages. Secondly, the Court concluded that the KMG Indicative Offer, which did form the basis for the SCC Tribunal's award of damages, could not constitute "false evidence" *per se* under Swedish law because it in fact had been issued by KMG in its stated amount of $199 million before the arbitration had commenced. The Court thus did not determine whether Defendants' alleged fraud, *i.e.*, obtaining the KMG Indicative Offer through use of falsified financial statements and then using the Indicative Offer in the SCC Arbitration, resulted in the SCC Tribunal awarding $199 million in compensation to Defendants.

189.     The Svea Court of Appeal did not address Kazakhstan's arguments that Defendants' false evidence and the fraudulent scheme affected the SCC Tribunal's assessment of its jurisdiction and of Kazakhstan's potential liability for damages.

190.     On February 3, 2017, Kazakhstan filed with the Swedish Supreme Court a motion to quash the Svea Court of Appeal's judgment due to grave procedural errors. That motion is pending before the Swedish Supreme Court.

191.     Defendants knowingly submitted pleadings and/or briefs in the Swedish Annulment Proceedings in furtherance of the fraudulent scheme. Defendants caused these pleadings and/or briefs to be sent through the United States mails, private or commercial

interstate carriers, and/or interstate wires in furtherance of Defendants' fraudulent scheme and/or to unjustly enrich themselves. Each mailing or wiring of pleading and/or brief is a violation of the federal mail fraud statute, 18 U.S.C. § 1341, or the federal wire fraud statute, 18 U.S.C. § 1343, and is an independent predicate act under 18 U.S.C. § 1961.

192.    On information and belief, in relation to the Swedish Annulment Proceedings, Defendants sent other communications through the United States mails, private or commercial interstate carriers, and/or interstate wires in furtherance of Defendants' fraudulent scheme and/or to unjustly enrich themselves. These other communications, on information and belief, included but are not limited to communications with Defendants' counsel in the United States. Each mailing or wiring of a communication in furtherance of the fraudulent scheme is a violation of the federal mail fraud statute, 18 U.S.C. § 1341, or the federal wire fraud statute, 18 U.S.C. § 1343, and is an independent predicate act under 18 U.S.C. § 1961.

193.    On information and belief, Defendants made payments to their counsel located in the United States from a place outside the United States for counsel's services related to the Swedish Annulment Proceedings in furtherance of Defendants' fraudulent scheme and/or to unjustly enrich themselves. Each such payment is a violation of the federal money laundering statute, 18 U.S.C. § 1956(a)(2)(A) & (B)(i), and is an independent predicate act under 18 U.S.C. § 1961.

## V.    DEFENDANTS ATTEMPT TO ENFORCE THE SCC AWARD

### A.    The Washington Enforcement Proceedings

194.    On February 4, 2014, Defendants filed a Petition to Confirm the SCC Award in the U.S. District Court for the District of Columbia. Defendants did not serve this petition and on May 7, 2014, voluntarily dismissed this action.

195.    On September 30, 2014, Defendants re-filed the Petition to Confirm in the U.S.

District Court for the District of Columbia. *Stati et al. v. Republic of Kazakhstan*, Civil Action

No. 14-1638 (D.D.C.) (ABJ) – the Washington Enforcement Proceedings.

196.    In the Washington Enforcement Proceedings, Defendants have represented that

the SCC Award is legitimate and claimed that it should be enforced pursuant to the New York

Convention when, in fact, the SCC Award was fraudulently obtained.

197.    Defendants are represented in the Washington Enforcement Proceedings by the

law firm of King & Spalding. Specifically, Defendants are represented by James E. Berger and

Charlene C. Sun of King & Spalding's New York office and Reginald R. Smith and Kevin D.

Mohr of King & Spalding's Houston office.

198.    On April 5, 2016, Kazakhstan filed a motion for leave to amend its opposition to

Defendants' petition to confirm to assert that Defendants engaged in a fraudulent scheme to *inter

alia* artificially inflate the construction costs of the LPG Plant, and then used these artificially

inflated costs to obtain the $199 million KMG Indicative Bid. During the SCC Arbitration,

Kazakhstan further asserted, Defendants represented to the SCC Tribunal that the fraudulently

obtained KMG Indicative Bid was a valid basis for awarding damages, and the Tribunal relied

upon the KMG Indicative Bid to award Defendants $199 million in compensation for the LPG

Plant.

199.    Kazakhstan asserted in its motion for leave to amend that this fraud gives rise to

two additional grounds under the New York Convention for non-recognition of the SCC Award:

(1) that the SCC Award is contrary to U.S. public policy (and, in the London Proceedings,

contrary to English public policy) in that it was obtained by fraud; and (2) that such fraud denied

Kazakhstan of the opportunity to present its case to the SCC Tribunal. Kazakhstan thus sought

leave to make the evidentiary showing of Defendants' fraud that is required to challenge the enforcement of a foreign arbitral award under Article 5(1) of the New York Convention ("Recognition and enforcement of the award may be refused, … only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof" of the ground for non-recognition).

200.    Defendants opposed Kazakhstan's motion for leave to amend, and falsely asserted that the alleged fraud did not "adversely affect[] the outcome of the arbitration." Kazakhstan rebutted this argument in its opening brief and reply brief, explaining that the KMG Indicative Offer was a direct result of Defendants' fraud.

201.    On May 11, 2016, this Court denied Kazakhstan's motion for leave to amend and relied on Defendants' representations in stating that: (i) "it is clear that the arbitrators did not rely upon the allegedly fraudulent evidence in reaching their decision" and (ii) "the issue [the alleged fraud] has already been presented to the Swedish authorities."

202.    On August 18, 2016, Kazakhstan filed a motion for reconsideration. Therein, Kazakhstan argued in part that the Court's conclusion (based on Defendants' representations) that the arbitrators did not rely on the alleged fraudulent evidence in reaching their decision was factually incorrect—the arbitrators relied upon the KMG Indicative Bid, which was procured by fraud.

203.    On August 5, 2016, without ruling on Kazakhstan's motion for reconsideration, the Court stayed the Washington Enforcement Proceedings pending the resolution of the proceedings before the Svea Court of Appeal. That stay was ultimately extended pending the conclusion of the proceedings before the Swedish Supreme Court.

204.    Defendants knowingly submitted pleadings and/or briefs in the Washington
Enforcement Proceedings in furtherance of Defendants' fraudulent scheme and/or to unjustly
enrich themselves. Defendants sent these pleadings and/or briefs through the United States mails,
private or commercial interstate carriers, and/or interstate wires in furtherance of Defendants'
fraudulent scheme and/or to unjustly enrich themselves. Each mailing or wiring of a pleading or
brief in furtherance of the fraudulent scheme is a violation of the federal mail fraud statute, 18
U.S.C. § 1341, or the federal wire fraud statute, 18 U.S.C. § 1343, and is an independent
predicate act under 18 U.S.C. § 1961.

205.    On information and belief, in relation to the Washington Enforcement
Proceedings, Defendants sent other communications through the United States mails, private or
commercial interstate carriers, and/or interstate wires in furtherance of Defendants' fraudulent
scheme and/or to unjustly enrich themselves. These other communications, on information and
belief, included but are not limited to communications with Defendants' counsel in the United
States. Each mailing or wiring of a communication in furtherance of the fraudulent scheme is a
violation of the federal mail fraud statute, 18 U.S.C. § 1341, or the federal wire fraud statute, 18
U.S.C. § 1343, and is an independent predicate act under 18 U.S.C. § 1961.

206.    On information and belief, Defendants made payments to their United States
counsel from a place outside the United States for counsel's services related to the Washington
Enforcement Proceedings in furtherance of Defendants' fraudulent scheme and/or to unjustly
enrich themselves. Each such payment is a violation of the federal money laundering statute, 18
U.S.C. § 1956(a)(2)(A) & (B)(i), and is an independent predicate act under 18 U.S.C. § 1961.

**B.      The London Enforcement Proceedings**

207.    On February 24, 2014, Defendants filed an *ex parte* application to enforce the SCC Award in the High Court of Justice, Queen's Bench Division, Commercial Court, in London, England (the "London Court"). On February 28, 2014, the London Court issued an order granting Defendants permission to enforce the SCC Award. The following year, on January 14, 2015, Defendants served the order on Kazakhstan. On April 7, 2015, Kazakhstan filed an application to annul and/or set aside the permission to enforce the SCC Award, setting out its then-known grounds under the New York Convention for challenging enforcement. Kazakhstan's filing effectively stayed the February 28, 2014 order until Kazakhstan's challenge is resolved by the London Court.

208.    Defendants are represented in the London Enforcement Proceedings by Thomas Sprange QC, Ruth Byrne and Egishe Dzhazoyan of King & Spalding's London office.

209.    As in the Washington Enforcement Proceedings, in the London Enforcement Proceedings, Defendants have represented that the SCC Award is legitimate and claimed that it should be enforced pursuant to the New York Convention.

210.    As in the Washington Enforcement Proceedings, Kazakhstan applied to amend its pleadings after Kazakhstan uncovered evidence of Defendants' fraud. Specifically, on August 27, 2015, Kazakhstan applied to amend its pleadings to add the contention that enforcement of the SCC Award would contravene English public policy by reason of fraud by Defendants.

211.    Defendants resisted Kazakhstan's application to amend to introduce evidence of the fraud.

**The June 6, 2017 Decision in the London Proceedings**

212.     In January 2017, Kazakhstan submitted extensive witness evidence, documents, and legal submissions in support of its application to amend its pleadings to add its fraud contention. This included witness statements and supporting documents from international accountants, construction engineers, Kazakhstan's counsel in the SCC Arbitration, and Kazakhstan's counsel in the Swedish Proceedings. Kazakhstan's witness evidence and documents totaled over 2,200 pages. Defendants also made extensive submissions.

213.     On February 6-7, 2017, the London Court held a hearing on Kazakhstan's application to amend and the underlying application to set aside the SCC Award.

214.     On June 6, 2017, on the basis of the evidence, and submissions of both parties, the London Court granted Kazakhstan's application to amend, holding that Kazakhstan had presented a "*sufficient prima facie case*" that the SCC Award was obtained by reason of Defendants' fraud. (Decision ¶ 37). This evidence supporting this *prima facie* case included that:

1)    Defendants conceded in the Swedish Proceedings that Perkwood was a Stati-related company, which was not Defendants' position in the SCC Arbitration (*id.* ¶ 26);

2)    related-party transactions between Perkwood and TNG artificially inflated the costs of the LPG plant (*see id.* ¶¶ 27, 28, 30, 31, 32);

3)    Defendants were required to disclose in the SCC Arbitration documents specifying the cost of construction of the LPG Plant yet did not disclose the Perkwood Agreement (*id.* ¶ 29); and

4)    Defendants concealed the true costs from TNG's auditors, KMG, Kazakhstan, and the SCC Tribunal (*id.* ¶ 34).

215.    The London Court went on to conclude that if Defendants dishonestly stated the costs of the LPG Plant in their financial statements, then the amount of KMG's Indicative Bid would have been a product of those false representations. *Id.* ¶¶ 38-49. In coming to this conclusion, the London Court explicitly rejected Defendants' arguments that there was no evidence that the KMG Indicative Bid relied on Defendants' allegedly false financial representations. *Id.* ¶ 39. This is because the KMG Indicative Bid itself states on its face that its estimated value of the LPG Plant is based on information contained in the Information Memorandum (*id.* ¶ 40), and the Information Memorandum was "expressly based" on the information in KPM and TNG's financial statements. *Id.* ¶ 42. As held by the London Court, that these financial statements make no reference to Perkwood being a related party "gives rise to the strongest suggestion that even the auditors of TNG did not know, with one consequence being that audit or review scrutiny of related-party dealings was avoided." *Id.* ¶ 71. Thus:  "[i]f construction costs were not US$245 million because that figure was fraudulently inflated by the [Defendants] . . . then, because the KMG Indicative Bid valued the LPG Plant using a calculation that brought costs of US$193 million into an arithmetical average there is the clearest argument that the KMG Indicative Bid would have been lower." *Id.* ¶ 43.

216.    Further, the London Court observed that the SCC Tribunal relied on the KMG Indicative Bid in issuing its award. *Id.* ¶¶ 45-49. Indeed, Defendants themselves "invited the Tribunal to have regard to the KMG Indicative Bid." *Id.* ¶ 45. They argued that "[l]ittle more [wa]s needed" to demonstrate the value of the LPG Plant. *See id.* In the SCC Award, the Tribunal referred to the KMG Indicative Bid as having "particular relevance" within "the relatively best source of information" for the valuation of the LPG Plant. *Id.* ¶ 47 (quoting SCC Award ¶¶ 1746, 1747); *see also id. ¶* 20 (In the SCC Tribunal's view, "'the relatively best source

for the valuation' [of the LPG Plant] were contemporaneous bids by third parties, and within those, the KMG Indicative Bid specifically.").

217.    As the London Court further noted, the Perkwood Agreement "was not produced in the Arbitration, and I am not satisfied the [Defendants] have properly explained why. It fell within the description of documents that the Tribunal required to be produced by the [Defendants] where in their possession custody or control. It was a very significant document, as the [Defendants] will have known." *Id.* ¶ 75.

218.    The London Court further found that "there is the necessary strength of prima facie case that the alleged fraud would have made a difference to the Tribunal. And that, in asking the Tribunal to rely on the Indicative Bid in circumstances (concealed from the Tribunal, as from the bidder) of the alleged fraud, there was a fraud on the Tribunal." *Id.*¶ 48. In summary, the London Court concluded that the alleged fraudulent "conduct itself, and the concealment of what had been done, had later consequences including for the audited or reviewed financial statements and the KMG Indicative Bid, and in turn the Award." *Id.* ¶ 49.

219.    Based on the foregoing, the London Court concluded that "there is a sufficient prima facie case that the [SCC] Award was obtained by fraud," and that the interests of justice require that Kazakhstan's fraud allegations be "examined at trial and decided on their merits" in the London Proceedings. *Id.* ¶¶ 92, 93.

*****

220.    By an order dated June 27, 2017, the London Court gave procedural directions for the trial of Kazakhstan's claim that the SCC Award was procured by fraud. The trial currently is scheduled to take place in November 2018.

221.     On July 18, 2017, Defendants filed an application seeking permission to appeal the June 6, 2017 decision. This application was not timely filed.

222.     On August 1, 2017, Kazakhstan filed its Points of Claim, setting out the factual points in support of its fraud defense.

223.     On September 26, 2017, Defendants filed their "Points of Defence" in response to Kazakhstan's Points of Claim.

224.     Defendants knowingly submitted pleadings, briefs, witness statements and other evidence in the London Enforcement Proceedings in furtherance of Defendants' fraudulent scheme and/or to unjustly enrich themselves.

225.     On information and belief, in relation to the London Enforcement Proceedings, Defendants sent communications through the United States mails, private or commercial interstate carriers, and/or interstate wires in furtherance of Defendants' fraudulent scheme and/or to unjustly enrich themselves. These communications, on information and belief, included but are not limited to communications with Defendants' counsel in the United States. Each mailing or wiring of a communication in furtherance of the fraudulent scheme is a violation of the federal mail fraud statute, 18 U.S.C. § 1341, or the federal wire fraud statute, 18 U.S.C. § 1343, and is an independent predicate act under 18 U.S.C. § 1961.

226.     On information and belief, Defendants made payments to their United States counsel from a place outside the United States for counsel's services related to the London Enforcement Proceedings in furtherance of Defendants' fraudulent scheme and/or to unjustly enrich themselves. Each such payment is a violation of the federal money laundering statute, 18 U.S.C. § 1956(a)(2)(A) & (B)(i), and is an independent predicate act under 18 U.S.C. § 1961.

### C.     The New York Enforcement Proceedings

227.     On June 15, 2017, Defendants initiated another lawsuit in the United States attempting to enforce, *inter alia*, the amount of the fraudulently procured SCC Award under the New York Uniform Foreign Country Money-Judgments Recognition Act, N.Y. C.P.L.R. §§ 5301-5309. That case was originally filed in the Supreme Court of the State of New York, County of New York: Commercial Division, and subsequently was removed by Kazakhstan to the U.S. District Court for the Southern District of New York. The case is captioned *Anatolie Stati et al. v. Republic of Kazakhstan*, No. 1:17-cv-05742-RA (S.D.N.Y.). On September 26, 2017, Kazakhstan filed a motion to dismiss or, in the alternative, stay these proceedings.

228.     Defendants are represented in the New York Enforcement Proceedings by James E. Berger, Charlene C. Sun, and Jessica Beess und Chrostin of King & Spalding's New York office.

229.     Defendants knowingly submitted their Complaint and other filings in the New York Enforcement Proceedings in furtherance of Defendants' fraudulent scheme and/or to unjustly enrich themselves. Defendants sent the pleading through the United States mails, private or commercial interstate carriers, and/or interstate wires in furtherance Defendants' fraudulent scheme. This is a violation of the federal mail fraud statute, 18 U.S.C. § 1341, or the federal wire fraud statute, 18 U.S.C. § 1343, and is an independent predicate act under 18 U.S.C. § 1961.

230.     On information and belief, in relation to the New York Enforcement Proceedings, Defendants sent other communications through the United States mails, private or commercial interstate carriers, and/or interstate wires in furtherance of Defendants' fraudulent scheme and/or to unjustly enrich themselves. These other communications, on information and belief, included but are not limited to communications with Defendants' counsel in the United States. Each

mailing or wiring of a communication in furtherance of the fraudulent scheme is a violation of the federal mail fraud statute, 18 U.S.C. § 1341, or the federal wire fraud statute, 18 U.S.C. § 1343, and is an independent predicate act under 18 U.S.C. § 1961.

231.    On information and belief, Defendants made payments to their counsel located in the United States from a place outside the United States for counsel's services related to the New York Enforcement Proceedings in furtherance of Defendants' fraudulent scheme and/or to unjustly enrich themselves. Each such payment is a violation of the federal money laundering statute, 18 U.S.C. § 1956(a)(2)(A) & (B)(i), and is an independent predicate act under 18 U.S.C. § 1961.

### D.    Other European Enforcement Actions

232.    After the London Court issued its June 6, 2017 ruling that Kazakhstan had established a "sufficient prima facie" case that Defendants had obtained the SCC Award by fraud, Defendants instituted enforcement proceedings in other European countries, including Sweden, the Netherlands, and Luxembourg (collectively, "Other European Enforcement Actions."). In none of these proceedings did Defendants inform the court of the June 6, 2017 decision.

233.    Defendants knowingly made submissions in the Other European Enforcement Actions in furtherance of Defendants' fraudulent scheme and/or to unjustly enrich themselves.

### 1.    The Sweden Enforcement Proceedings

234.    On August 18, 2017, Defendants filed with the Stockholm District Court a request for an *ex parte* provisional freezing order against Kazakhstan's assets in Sweden to the extent necessary to satisfy Defendants' claim under the SCC Award.

235.     On August 21, 2017, the Stockholm District Court granted Defendants' request. On the same date, Defendants requested that the Swedish Enforcement Authority sequester certain securities and bank funds situated in Sweden that purportedly belong to Kazakhstan. The Swedish Enforcement Authority rendered four provisional sequestration orders on August 23, 24, 25 and 29, 2017.

236.     The Stockholm District Court has not yet served its August 21, 2017 decision on Kazakhstan. Once served, Kazakhstan will have three weeks to reply to Defendants' application for a provisional freezing order.

237.     On September 6, 2017, the Swedish Enforcement Authority issued two orders, after having both parties comment on the freezing of the assets at hand. By the first order, the Swedish Enforcement Authority refused to freeze bank funds and repealed its provisional order concerning these funds. By the second order, the Swedish Enforcement Authority froze the remaining assets purportedly belonging to Kazakhstan and repealed two provisional orders concerning securities and proceeds from those securities.

238.     On September 11, 2017, the Swedish Enforcement Authority ordered that certain subscription rights be sold and that the proceeds be frozen.

239.     Kazakhstan's appeal of the Swedish Enforcement Authority's freezing orders must be filed with the Nacka District Court by October 6, 2017.

240.     The Swedish Enforcement Authority issued a new provisional order on September 27, 2017, concerning a refund of tax on dividends. A decision on whether to freeze those assets is expected on October 4–6, 2017.

## 2.     The Netherlands Enforcement Proceedings

241.     On August 23, 2017, Defendants filed an *ex parte* application with the District Court at Amsterdam, the Netherlands (the "Dutch Court"), seeking leave to levy a number of pre-judgment attachments against assets purportedly belonging to Kazakhstan. On August 31, 2017, Defendants filed an amended *ex parte* application with the Dutch Court. In their applications, Defendants failed to apprise the Dutch Court of Kazakhstan's position that the SCC Award was obtained by fraud and of the decision rendered by the London Court on June 6, 2017. In a decision of the acting president of the Amsterdam District Court of September 8, 2017, some but not all of the *ex parte* pre-judgment attachments were authorized. The Dutch Court authorized the levying of the attachments under the condition that Defendants institute proceedings on the merits — *i.e.*, the request for an exequatur — within 12 weeks after the date on which the first attachment is levied. The attachments were levied on September 14, 2017.

### 3.     Luxembourg Enforcement Proceedings

242.     On August 16, 2017, Defendants *ex parte* served a garnishment order based on the SCC Award to presumed debtors of Kazakhstan located in the Grand Duchy of Luxembourg in order to freeze certain specified monies.

243.     Further to these initial *ex parte* actions Defendants served a summons to Kazakhstan to appear before the competent Luxembourg judge in order for the garnishment to be validated and so to obtain payments from the presumed debtors.

244.     As both the garnishment order and its validation action are based on the SCC Award it has to be recognized in the Grand-duchy of Luxembourg. Therefore, Defendants filed on August 24, 2017 an *ex parte* request for exequatur of the SCC Award with the President of the Luxembourg District Tribunal.

245.    On August 30, 2017, the first Vice–President of the Luxembourg District

Tribunal, in lieu of the President of the Luxembourg District Tribunal, granted the exequatur to

the SCC Award requested by Defendants.

*****

246.    On information and belief, in relation to the Other European Enforcement

Actions, Defendants sent communications through the United States mails, private or

commercial interstate carriers, and/or interstate wires in furtherance of Defendants' fraudulent

scheme and/or to unjustly enrich themselves. These communications, on information and belief,

included but are not limited to communications with Defendants' counsel in the United States.

Each mailing or wiring of a communication in furtherance of the fraudulent scheme is a violation

of the federal mail fraud statute, 18 U.S.C. § 1341, or the federal wire fraud statute, 18 U.S.C. §

1343, and is an independent predicate act under 18 U.S.C. § 1961.

247.    On information and belief, Defendants made payments to their counsel located in

the United States from a place outside the United States for counsel's services related to the

Other European Enforcement Actions in furtherance of Defendants' fraudulent scheme and/or to

unjustly enrich themselves. Each such payment is a violation of the federal money laundering

statute, 18 U.S.C. § 1956(a)(2)(A) & (B)(i), and is an independent predicate act under 18 U.S.C.

§ 1961.

## VI.    DEFENDANTS INSTITUTE SECTION 1782 PROCEEDINGS IN THE UNITED STATES

248.    In addition to the Washington, London and New York Enforcement Proceedings,

described above, Defendants filed four proceedings in the United States pursuant to 28 U.S.C.

§1782 seeking information regarding Kazakhstan's assets, purportedly in aid of Defendants'

attempt to execute, and ultimately attach Kazakhstan's assets in satisfaction of, any order

obtained in the London Enforcement Proceedings or other European countries confirming the
SCC Award:

1)      On December 22, 2014, Defendants filed a Petition Ex Parte for
        Assistance in Aid of a Foreign Proceeding Pursuant to 28 U.S.C. § 1782
        against Bank of New York Mellon Corporation in the U.S. District Court
        for the Southern District of New York, captioned *Anatolie Stati et al. v.
        Bank of New York Mellon Corporation*, No. 1:14-mc-00425 (S.D.N.Y.).
        The petition was granted on December 30, 2014.

2)      On February 25, 2015, Defendants filed a Motion Ex Parte for Assistance
        in Aid of a Foreign Proceeding Pursuant to 28 U.S.C. § 1782 against State
        Street Corporation in the U.S. District Court for the District of
        Massachusetts, captioned *Anatolie Stati et al. v. State Street Corporation*,
        No. 1:15-mc-91059-LTS (D. Mass.). The petition was granted on March
        2, 2015.

3)      On February 26, 2015 Defendants filed an Ex Parte Petition for Assistance
        in Aid of a Foreign Proceeding Pursuant to 28 U.S.C. § 1782 against BNP
        Paribas Asset Management, Inc. and Fischer, Francis, Trees & Watts, Inc.
        in the U.S. District Court for the Southern District of New York, captioned
        *Anatolie Stati et al. v. BNP Paribas Asset Management, Inc.*, No. 1:15-mc-
        0051-P1 (S.D.N.Y.). The petition was granted on March 2, 2015.

4)      On February 26, 2015, Defendants filed an Ex Parte Petition for
        Assistance in Aid of a Foreign Proceeding Pursuant to 28 U.S.C. § 1782
        against ABN Amro Holdings US LLC in the U.S. District Court for the

Southern District of New York, captioned *Anatolie Stati et al. v. ABN Amro Holdings USA LLC*, No. 1:15-mc-00052-P1 (S.D.N.Y.). The petition was granted on March 2, 2015.

249.    Defendants knowingly submitted pleadings and/or briefs in the above-referenced 28 U.S.C. § 1782 Proceedings ("Defendants' § 1782 Proceedings"), in furtherance of Defendants' fraudulent scheme and/or to unjustly enrich themselves. Defendants sent these pleadings and/or briefs through the United States mails, private or commercial interstate carriers, and/or interstate wires in furtherance Defendants' fraudulent scheme and/or to unjustly enrich themselves. Each mailing or wiring of pleading is a violation of the federal mail fraud statute, 18 U.S.C. § 1341, or the federal wire fraud statute, 18 U.S.C. § 1343, and is an independent predicate act under 18 U.S.C. § 1961.

250.    On information and belief, in relation to Defendants' § 1782 Proceedings, Defendants sent other communications through the United States mails, private or commercial interstate carriers, and/or interstate wires in furtherance of Defendants' fraudulent scheme and/or to unjustly enrich themselves. These other communications, on information and belief, included but are not limited to communications with Defendants' counsel in the United States. Each mailing or wiring of a communication in furtherance of the fraudulent scheme is a violation of the federal mail fraud statute, 18 U.S.C. § 1341, or the federal wire fraud statute, 18 U.S.C. § 1343, and is an independent predicate act under 18 U.S.C. § 1961.

251.    On information and belief, Defendants made payments to their counsel located in the United States from a place outside the United States for counsel's services related to Defendants' 28 U.S.C. § 1782 Proceedings in furtherance of Defendants' fraudulent scheme and/or to unjustly enrich themselves. Each such payment is a violation of the federal money

- 70 -

laundering statute, 18 U.S.C. § 1956(a)(2)(A) & (B)(i), and is an independent predicate act under 18 U.S.C. § 1961.

## DAMAGES SUFFERED BY KAZAKHSTAN

252.    Kazakhstan has sustained damages in the United States, and other jurisdictions, that are the direct and proximate result of wrongful actions of Defendants and others known and unknown to Kazakhstan. Such damages are ongoing, and include, but are not limited to damages, direct, indirect, collateral, consequential, and incidental, to Kazakhstan's property. Kazakhstan's damages include the legal fees and expenses incurred by Kazakhstan in the United States, and other jurisdictions, as a result of Defendants' wrongful actions.

## COUNT I

## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

## CONDUCTING THE AFFAIRS OF THE ENTERPRISE THROUGH A PATTERN OF RACKETEERING ACTIVITY

### (18 U.S.C. §§ 1962(c) and 1964(c))

### (Against all Defendants)

253.    Kazakhstan re-alleges and incorporates by reference each and every allegation in paragraphs 1-252 above as if set forth fully herein.

## I.    THE ENTERPRISE

254.    Each Defendant was, at all relevant times, a "person" within the meaning of 18 U.S.C. § 1961(3).

255.    From no later than February 2006, continuing through the date of the filing of this Complaint, Defendants, and others known and unknown, including agents and employees of Anatolie Stati, the Statis and/or the Stati Companies, formed an associated-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) ("the Enterprise").

256.    Defendant Anatolie Stati is the father of Defendant Gabriel Stati. Anatolie Stati is the 100% owner of Defendant Ascom. Defendant Terra Raf is owned 50/50 by Anatolie and Gabriel Stati. The Enterprise also consists of other Stati Companies, including but not limited to TNG, KPM, Tristan, and Perkwood, and agents and employees of Anatolie Stati, the Statis and/or the Stati Companies.

257.    From no later than December 2006, continuing through the date of the filing of this Complaint, the Enterprise formed by these parties engaged in activities which affected interstate and foreign commerce.

258.    Defendants operated the Enterprise to defraud Kazakhstan and others of money and property and/or to unjustly enrich themselves.

259.    From no later than July 2010, continuing through the date of the filing of this Complaint, Anatolie Stati, Gabriel Stati, and the Stati Companies, each of them individually, and together with others known and unknown to Kazakhstan, acting in concert, were each employed by or associated with the Enterprise and have in the past, continuously and continue to, in an ongoing manner, knowingly and intentionally conduct the activities of the Enterprise, directly or indirectly, through a continued pattern of racketeering activity consisting of numerous acts of racketeering in the United States and elsewhere. Their actions include multiple, related acts in violation of the following provisions of the United States Code:  18 U.S.C. §§ 1341, 1343, 1956(a)(2)(A) & (B)(i). These violations were and are in furtherance of the Enterprise's ongoing schemes to defraud Kazakhstan, and others of money and property and/or to unjustly enrich themselves.

260.    From no later than July 2010, the Enterprise has existed separate and apart from Defendants' racketeering acts and their conspiracy to commit such acts. The Enterprise has an

ascertainable structure and purpose beyond the scope and commission of Defendants' predicate acts.

## II.   THE PATTERN OF RACKETEERING ACTIVITY

261.   The Enterprise as described herein is at all relevant times a continuing enterprise because it continues to execute schemes to defraud Kazakhstan and others, and unjustly enrich Defendants. The conduct of the Enterprise has continued from its inception through the date of this Complaint and threatens to continue into the future, by virtue of Defendants' continued attempts to enforce the fraudulently obtained SCC Award and continued efforts to block Kazakhstan's introduction of evidence of their fraud in various legal and arbitral proceedings.

262.   The pattern of racketeering activity, as defined by 18 U.S.C. §§ 1961(1) and (5), presents both a history of criminal conduct and a distinct threat of continuing criminal activity. Such activity consists of multiple acts of racketeering by each Defendant herein, is interrelated, not isolated, and is perpetrated for the same or similar purposes by the same persons. Such activity extends over a substantial period of time, up to and beyond the date of this Complaint. Such activities occurred after the effective date of 18 U.S.C. §§ 1961 *et seq.*, and the last such act occurred within 10 years after the commission of a prior act of racketeering activity.

263.   These racketeering activities include multiple repeated acts of mail fraud (18 U.S.C. § 1341) and/or wire fraud (18 U.S.C. § 1343). Each pleading, brief, witness statement and/or other evidence in the SCC Arbitration, the Swedish Annulment Proceedings, the Washington Enforcement Proceedings, the New York § 1782 Proceedings, Defendants' § 1782 Proceedings, and the New York Enforcement Proceedings submitted through the United States mails, private or commercial interstate carriers, and/or interstate wires in furtherance of Defendants' fraudulent scheme to defraud Kazakhstan of money and property and/or to unjustly

enrich Defendants through inflation of construction costs on the basis of false or otherwise misleading information in violation of 18 U.S.C. §§ 1341, 1343, and 2, is highlighted in the charts below:

<u>The SCC Arbitration</u>[3]

| Date | Event |
|---|---|
| July 26, 2010 | Stati Parties submit Request for Arbitration |
| August 5, 2010 | SCC writes to Kazakhstan, enclosing the Request for Arbitration and requesting its Answer by 26 August 2010 |
| August 9, 2010 | Kazakh Ministry of Justice receives the SCC's letter dated 5 August 2010 |
| August 11, 2010 | SCC's letter dated 5 August 2010 reaches DPSPR |
| August 27, 2010 | SCC writes to Kazakhstan, extending deadline for its Answer to 10 September 2010 |
| August 31, 2010 | Kazakh Ministry of Justice receives the SCC's letter dated 27 August 2010 |
| September 1, 2010 | SCC's letter dated 27 August 2010 reaches DPSPR |
| September 13, 2010 | Stati Parties write to the SCC, asking it to appoint an arbitrator on Kazakhstan's behalf |
| September 13, 2010 | SCC forwards Stati Parties' 13 September 2010 letter to Kazakhstan by registered mail |
| September 15, 2010 | SCC Board Meeting takes place, at which Professor Lebedev is nominated for appointment as arbitrator for Kazakhstan |
| September 20, 2010 | SCC informs Professor Lebedev by email of his appointment as arbitrator for Kazakhstan |

---

[3] For clarity, Defendants (Anatolie Stati, Gabriel Stati, Ascom, and Terra Raf) are referred to in the following charts as "Stati Parties." The predicate acts of mail and/or wire fraud are those entries highlighted in yellow. To provide context, Kazakhstan has also provided the dates of other events in the various proceedings. Those other events, which are not highlighted, are not predicate acts.

| Date | Event |
|---|---|
| September 21, 2010 | Professor Lebedev submits his formal confirmation of acceptance of his appointment |
| September 23, 2010 | SCC writes to the parties, informing them of Professor Lebedev's appointment as arbitrator for Kazakhstan, and the selection of the seat of the Arbitration as Stockholm |
| September 23, 2010 | Kazakhstan receives the SCC's letter dated 13 September 2010 (enclosing Stati Parties' request for the appointment of an arbitrator on Kazakhstan's behalf) |
| September 27, 2010 | Professor Böckstiegel submits his formal confirmation of acceptance of his appointment |
| September 28, 2010 | SCC writes to the parties, informing them of Professor Böckstiegel's appointment as Chairman of the Tribunal |
| November 5, 2010 | Kazakhstan executes Power of Attorney authorizing Curtis Mallet to act on its behalf in the Arbitration |
| December 2, 2010 | Kazakhstan objects to the appointment of Professor Lebedev, and requests an opportunity to appoint its arbitrator |
| December 6, 2010 | SCC writes to Stati Parties and the Tribunal, requesting comments on Kazakhstan's letter dated 2 December 2010 |
| December 7, 2010 | Stati Parties (through counsel) write to the SCC, requesting the dismissal of Kazakhstan's request to appoint an arbitrator under Article 15 of the SCC Rules |
| December 15, 2010 | SCC Board Meeting takes place, at which Kazakhstan's objection to the appointment of Professor Lebedev is dismissed (Stevens expressed as not participating in this decision) |
| December 15, 2010 | SCC writes to the parties and the Tribunal, stating that no ground for the disqualification of Professor Lebedev has been found, and that Kazakhstan's challenge has been dismissed |
| January 18, 2011 | Kazakhstan writes to the Tribunal, suggesting a 3-month stay of proceedings without prejudice to Kazakhstan's jurisdictional objections |

| Date | Event |
|---|---|
| January 24, 2011 | Stati Parties write to Kazakhstan (through counsel), rejecting Kazakhstan's proposal and counter-proposing a 60-day stay on condition of Kazakhstan's waiver of jurisdictional objection |
| January 28, 2011 | Kazakhstan writes to Stati Parties (through counsel), rejecting their proposal and reiterating proposal of 3-month stay without waiver of jurisdictional objection |
| February 2, 2011 | Stati Parties write to Kazakhstan (through counsel), proposing a 90-day stay without any request for waiver of jurisdictional objection |
| February 6, 2011 | Kazakhstan writes to Stati Parties (through counsel), proposing briefing schedule for 3-month stay |
| May 12, 2011 | Stati Parties submit Romanosov Witness Statement |
| May 17, 2011 | Stati Parties submit Lungu Witness Statement |
| May 17, 2011 | Stati Parties submit Anatolie Stati Witness Statement |
| May 17, 2011 | Stati Parties submit FTI Expert Report |
| May 17, 2011 | Stati Parties submit Ryder Scott Expert Report |
| May 18, 2011 | Stati Parties submit Statement of Claim |
| November 17, 2011 | Kazakhstan submits GCA Expert Report |
| November 21, 2011 | Kazakhstan submits Deloitte TCF Expert Report |
| November 21, 2011 | Kazakhstan submits Statement of Defense |
| April 11, 2012 | Stati Parties submit Broscaru Witness Statement |
| May 5, 2012 | Stati Parties submit Lungu Second Witness Statement |
| May 7, 2012 | Stati Parties submit Reply Memorial on Jurisdiction and Liability |
| May 7, 2012 | Stati Parties submit Anatolie Stati Second Witness Statement |
| May 28, 2012 | Stati Parties submit Reply Memorial on Quantum |
| May 28, 2012 | Stati Parties submit FTI Supplemental Expert Report |

| Date | Event |
|---|---|
| May 28, 2012 | Stati Parties submit Ryder Scott Second Expert Report |
| August 11, 2012 | Kazakhstan submits Medet Suleimenov Witness Statement |
| August 13, 2012 | Kazakhstan submits Rejoinder on Jurisdiction and Liability |
| October 1-8, 2012 | Hearing on Jurisdiction and Merits |
| November 27, 2012 | Kazakhstan submits Khalelov Witness Statement |
| November 29, 2012 | Kazakhstan submits GCA Second Expert Report |
| November 30, 2012 | Kazakhstan submits Deloitte GmbH Expert report |
| December 1, 2012 | Kazakhstan submits Rejoinder Memorial on Quantum |
| January 25, 2013 | Stati Parties submit Amendments to FTI Expert Report |
| January 28-31, 2013 | Hearing on Quantum |
| April 4, 2013 | Kazakhstan submits GCA Third Expert Report |
| April 6, 2013 | Kazakhstan submits Deloitte GmbH Second Expert Report |
| April 8, 2013 | Stati Parties submit First Post-Hearing Brief |
| April 8, 2013 | Kazakhstan submits First Post-Hearing Brief |
| April 8, 2013 | Stati Parties submit Third FTI Expert Report |
| April 8, 2013 | Stati Parties submit Third Ryder Scott Expert Report |
| May 2-3, 2013 | Final Hearing |
| June 3, 2013 | Stati Parties submit Second Post-Hearing Brief |
| June 3, 2013 | Kazakhstan submits Second Post-Hearing Brief |
| June 3, 2013 | Stati Parties submit FTI Post-Hearing Report |
| June 3, 2013 | Stati Parties submit Ryder Scott Fourth Expert Report |
| December 19, 2013 | SCC issues Final Award |

The Swedish Annulment Proceedings

| Date | Event |
|---|---|
| March 19, 2014 | Kazakhstan files statement of claim to set aside the SCC Award |
| April 30, 2014 | Court issues writ of summons |
| June 27, 2014 | Stati Parties file statement of defense |
| November 29, 2014 | Kazakhstan files reply in support of statement of claim to set aside the SCC Award |
| March 9, 2015 | Kazakhstan files preliminary statement of evidence |
| April 13, 2015 | Kazakhstan files additions to preliminary statement of evidence |
| April 15, 2015 | Stati Parties file submission and preliminary statement of evidence |
| July 14, 2015 | Kazakhstan files submission |
| August 24, 2015 | Stati Parties file submission and comments on Court's draft case recitals |
| October 5, 2015 | Kazakhstan files submission introducing the Stati Parties' fraudulent scheme and use of false evidence in the SCC Arbitration |
| October 16, 2015 | Kazakhstan files final statement of evidence |
| October 23, 2015 | Stati Parties file final statement of evidence |
| October 30, 2015 | Stati Parties file submission addressing the fraudulent scheme and invocation of false evidence in the SCC Arbitration |
| November 9, 2015 | Court continues November 30, 2015 hearing date |
| November 23, 2015 | Kazakhstan files submission and preliminary statement of evidence in support of Stati Parties' fraudulent scheme and invocation of false evidence in the SCC Arbitration |
| January 18, 2016 | Kazakhstan files request for document production (complete customs declarations) |
| February 2, 2016 | Stati Parties file answer to request for document production, stating that they lack access to the complete customs declarations |

| Date | Event |
|---|---|
| February 8, 2016 | Kazakhstan withdraws request for document production |
| February 11, 2016 | Stati Parties file submission on case management |
| February 18, 2016 | Kazakhstan files response to submission on case management |
| March 21, 2016 | Stati Parties file consolidated statement of evidence |
| March 21, 2016 | Kazakhstan files comments on Court's draft case recitals and asks that the Court orders Stati Parties to give their position on Kazakhstan's allegations of the fraudulent scheme and invocation of false evidence |
| March 22, 2016 | Stati Parties file response to Kazakhstan's March 21, 2016 comments |
| April 1, 2016 | Stati Parties file further response to Kazakhstan's March 21, 2016 comments |
| April 1, 2016 | Kazakhstan files response to Stati Parties' March 22, 2016 response re Court's draft case recitals |
| April 5, 2016 | Stati Parties file proposal for topic to be discussed at the oral preparatory hearing |
| April 6, 2016 | Court conducts oral preparatory hearing; counsel participate |
| April 6, 2016 | Kazakhstan files consolidated preliminary statement of evidence |
| April 27, 2016 | Kazakhstan files comments on Court's draft case recitals |
| May 18, 2016 | Stati Parties file consolidated statement of evidence and request that Court dismiss Kazakhstan's evidence of the fraudulent scheme and invocation of false evidence |
| June 3, 2016 | Kazakhstan files final statement of evidence, responds to Stati Parties' request to dismiss evidence, requests that Court dismiss certain evidence invoked by Stati Parties |
| June 13, 2016 | Stati Parties file updated final statement of evidence and response to Kazakhstan's June 3, 2016 submission |
| June 17, 2016 | Kazakhstan files updated final statement of evidence and response to Stati Parties' June 13, 2016 submission |

| Date | Event |
|---|---|
| June 29, 2016 | Court issues decision rejecting the parties' respective requests for dismissal of evidence |
| July 8, 2016 | Kazakhstan files updated final statement of evidence and accompanying submission |
| July 15, 2016 | Stati Parties file response to Kazakhstan's July 8, 2016 submission. Preparatory phase of the proceedings closes |
| July 20, 2016 | Court issues hearing schedule |
| July 20, 2016 | Kazakhstan files comments on the hearing schedule |
| August 15, 2016 | Stati Parties file request to allow new evidence and updated final statement of evidence |
| August 22, 2016 | Kazakhstan files request to allow new evidence and updated final statement of evidence |
| August 30, 2016 | Stati Parties file request to allow new evidence and updated final statement of evidence |
| September 5, 2016 | Kazakhstan files request to allow new evidence and updated final statement of evidence |
| September 7, 2016 | Kazakhstan files updated final statement of oral evidence |
| September 8, 2016 | Day 1, Main Hearing:  Kazakhstan's opening statement |
| September 9, 2016 | Day 2, Main Hearing:  Kazakhstan's opening statement |
| September 13, 2016 | Day 3, Main Hearing:  Stati Parties' opening statement |
| September 15, 2016 | Day 4, Main Hearing:  Kazakhstan's opening statement. Parties file updated final statements of evidence |
| September 16, 2016 | Day 5, Main Hearing:  Expert testimony by Ernst Kallweit; witness testimony by Franjo Zaja. |
| September 22, 2016 | Kazakhstan files comments on Court's case recitals and addition to final statement of evidence |
| September 26, 2016 | Day 6, Main Hearing:  procedural issues |

| Date | Event |
|---|---|
| September 27, 2016 | Day 7, Main Hearing:  witness testimony by Kenneth Fleuriet |
| September 28, 2016 | Day 8, Main Hearing:  witness testimony by Dr. Thomas Grant |
| September 29, 2016 | Day 9, Main Hearing:  expert testimony by Thomas Gruhn |
| October 3, 2016 | Day 10, Main Hearing:  expert testimony by Dr. Horacio A. Grigera Naón; witness testimony by Johan Gernandt |
| October 4, 2016 | Day 11, Main Hearing:  expert testimony by Gary B. Born |
| October 5, 2016 | Day 12, Main Hearing:  Kazakhstan's closing argument |
| October 6, 2016 | Day 13, Main Hearing:  Stati Parties' closing argument |
| October 28, 2016 | Parties file statements of costs |
| November 7, 2016 | Parties file responses to statements of costs |
| December 9, 2016 | Court issues final judgment |

<u>The Washington Enforcement Proceedings</u>

| Date | Event |
|---|---|
| September 30, 2014 | Stati Parties file Petition to Confirm Arbitral Award |
| November 13, 2014 | Return of Service/Affidavit of Summons and Complaint Executed as to Kazakhstan |
| February 26, 2015 | Kazakhstan files Opposition to Petition to Confirm Arbitral Award |
| April 23, 2015 | Stati Parties file Reply re Petition to Confirm Arbitral Award |
| May 26, 2015 | Kazakhstan files Surreply in Support of Opposition to Petition to Confirm Arbitral Award |
| May 29, 2015 | Kazakhstan files Motion for Oral Argument |
| May 29, 2015 | Minute Order denying Kazakhstan's Motion for Oral Argument |

| Date | Event |
|------|-------|
| October 21, 2015 | Minute Order requiring the parties to file a memorandum on the Court's subject matter jurisdiction under the Federal Arbitration Act and the Foreign Sovereign Immunities Act |
| November 9, 2015 | Stati Parties file Response to the Court's 10/21/2015 Minute Order |
| November 9, 2015 | Kazakhstan files Response to the Court's 10/21/2015 Minute Order |
| April 5, 2016 | Kazakhstan files Motion for Leave to File Additional Grounds in Support of Opposition to Petition to Confirm Arbitral Award |
| April 25, 2016 | Stati Parties file Memorandum in Opposition to Kazakhstan's Motion for Leave to File Additional Grounds in Support of Petition to Confirm Arbitral Award |
| May 5, 2016 | Kazakhstan files Reply in Support of Motion for Leave to File Additional Grounds in Support of Opposition to Petition to Confirm Arbitral Award |
| May 11, 2016 | Order denying Kazakhstan's Motion for Leave to File Additional Grounds in Support of Opposition to Petition to Confirm Arbitral Award |
| May 18, 2016 | Kazakhstan files Motion for Reconsideration of May 11, 2016 Order |
| June 1, 2016 | Stati Parties file Opposition to Kazakhstan's Motion for Reconsideration of May 11, 2016 Order |
| June 3, 2016 | Kazakhstan files Reply in Support of Motion for Reconsideration of May 11, 2016 Order |
| June 10, 2016 | Minute Order requiring the parties to file Memoranda regarding whether the matter should be stayed pending the resolution of the set-aside proceedings in Sweden |
| June 24, 2016 | Stati Parties file Memorandum in Response to 6/10/2016 Minute Order |
| June 24, 2016 | Kazakhstan files Memorandum in Response to 6/10/2016 Minute Order |
| July 6, 2016 | Kazakhstan files Response to Stati Parties' Memorandum in Response to 6/10/2016 Minute Order |
| July 7, 2016 | Minute Order taking issue of stay under advisement |

| Date | Event |
|---|---|
| August 5, 2016 | Memorandum Opinion and Order finding that the Court has jurisdiction over the dispute and staying consideration on the merits until the issuance of the Svea Court of Appeal Decision. |
| December 30, 2016 | Joint Status Report Regarding Svea Court of Appeal Decision |
| February 3, 2017 | Joint Status Report Concerning Status of Proceedings in Sweden |
| February 21, 2017 | Kazakhstan files Response to Stati Parties' Status Report (converted to Motion to Lift Stay) |
| February 28, 2017 | Stati Parties file Reply in Support of Status Report (converted to Motion to Lift Stay) |
| May 31, 2017 | Joint Status Report Regarding Status of Swedish Supreme Court Proceedings |
| June 15, 2017 | Kazakhstan files Response to Stati Parties' Status Report (converted to Motion to Lift Stay) |
| June 15, 2017 | Kazakhstan files Notice of Supplemental Authority regarding its Motion for Reconsideration of May 11, 2016 Order |
| June 22, 2017 | Stati Parties file Reply in Support of Status Report (converted to Motion to Lift Stay) |
| July 5, 2017 | Stati Parties file Response to Kazakhstan's Notice of Supplemental Authority |
| September 26, 2017 | Stati Parties file Status Report Concerning Status of Proceedings in Sweden |
| September 29, 2017 | Kazakhstan files Status Report Concerning Status of Proceedings in Sweden |
| September 29, 2017 | Stati Parties file Motion to Lift Stay |
| September 29, 2017 | Stati Parties file Status Report Concerning Status of Proceedings in Sweden |

The New York § 1782 Proceedings

| Date | Event |
|---|---|
| March 27, 2015 | Kazakhstan files Ex Parte Petition for Discovery in Aid of a Foreign Proceeding Pursuant to 28 U.S.C. § 1782 |
| March 30, 2015 | Order granting Ex Parte Petition for Discovery in Aid of a Foreign Proceeding Pursuant to 28 U.S.C. § 1782 |
| April 9, 2015 | Letter from Stati Parties to Judge Kimba M. Wood requesting interim stay of the March 30, 2015 Order and subpoena pending resolution of forthcoming motion to intervene |
| April 10, 2015 | Letter from Kazakhstan to Judge Kimba M. Wood requesting that Stati Parties' request for an interim stay of the March 30, 2015 Order and subpoena be denied |
| April 10, 2015 | Stati Parties file Motion to Intervene |
| April 21, 2015 | Kazakhstan files Opposition to Stati Parties' Motion to Intervene |
| April 27, 2015 | Stati Parties file Reply in Support of Motion to Intervene |
| April 28, 2015 | Oral Argument held before the Honorable Sidney H. Stein |
| June 22, 2015 | Memorandum and Order denying Stati Parties' motion to vacate the March 30, 201 Order and quash the subpoena to Clyde & Co |

Defendants' § 1782 Proceedings

| Date | Event |
|---|---|
| December 22, 2014 | Stati Parties file Petition Ex Parte for Assistance in Aid of a Foreign Proceeding Pursuant to 28 U.S.C. § 1782 against Bank of New York Mellon Corporation in the U.S. District Court for the District of New York, captioned *Anatolie Stati et al. v. Bank of New York Mellon Corp.*, No. 1:14-mc-00425 (S.D.N.Y.) ("Bank of New York Proceedings") |
| December 30, 2014 | Petition Granted in Bank of New York Proceedings |

| Date | Event |
|---|---|
| February 25, 2015 | Stati Parties file Petition Ex Parte for Assistance in Aid of a Foreign Proceeding Pursuant to 28 U.S.C. § 1782 against State Street Corporation in the U.S. District Court for the District of Massachusetts, captioned *Anatolie Stati et al. v. State Street Corp.*, No. 1:15-mc-91059-LTS (D. Mass.) ("State Street Proceedings") |
| February 26, 2015 | Stati Parties file Petition Ex Parte for Assistance in Aid of a Foreign Proceeding Pursuant to 28 U.S.C. § 1782 against BNP Paribas Asset Management, Inc. and Fischer, Francis, Trees & Watts, Incorporated in the U.S. District Court for the Southern District of New York captioned *Anatolie Stati et al. v. BNP Paribas Asset Management, Inc.*, No. 1:15-mc-0051-P1 (S.D.N.Y.) ("BNP Paribas Proceedings") |
| February 26, 2015 | Stati Parties file Petition Ex Parte for Assistance in Aid of a Foreign Proceeding Pursuant to 28 U.S.C. § 1782 against ABN Amro Holdings US LLC in the U.S. District Court for the Southern District of New York captioned *Anatolie Stati et al. v. ABN Amro Holdings USA LLC*, No. 1:15-mc-0052-P1 (S.D.N.Y.) ("ABN Amro Proceedings") |
| March 2, 2015 | Petition Granted in State Street Proceedings |
| March 2, 2015 | Petition Granted in BNP Paribas Proceedings |
| March 3, 2015 | Petition granted in ABN Amro Proceedings |

The New York Enforcement Proceedings

| Date | Event |
|---|---|
| June 15, 2017 | Stati Parties file Complaint to enforce, *inter alia*, amount of the SCC Award |
| July 31, 2017 | Kazakhstan removes to federal court (S.D.N.Y.) |
| September 1, 2017 | Joint Letter regarding Case Management Plan/Scheduling Order |
| September 26, 2017 | Kazakhstan moves to dismiss action |

264.     Kazakhstan is the direct victim of Defendants' use of the United States mails, private or commercial interstate carriers, and/or wires, as set forth above, in furtherance of their fraudulent scheme.

265.     Kazakhstan relied on the pleadings, briefs, witness statements and/or other evidence submitted by Defendants in the SCC Arbitration. The SCC Tribunal relied on the pleadings, briefs, witness statements and/or other evidence submitted by Defendants in the SCC Arbitration.

266.     Kazakhstan relied on the pleadings, briefs, witness statements and/or other evidence submitted by Defendants in the Swedish Annulment Proceedings. The Svea Court of Appeal relied on Defendants' pleadings, briefs, witness statements and/or other evidence in the Swedish Annulment Proceedings.

267.     Kazakhstan relied on the pleadings, briefs, witness statements and/or other evidence submitted by Defendants in the London Enforcement Proceedings. The London Court relied, and will continue to rely, on Defendants' pleadings, briefs, witness statements and/or other evidence in the London Enforcement Proceedings.

268.     Kazakhstan relied on the pleadings, briefs, witness statements and/or other evidence submitted by Defendants in the Washington Enforcement Proceedings. The U.S. District Court for the District of Columbia relied, and will continue to rely, on Defendants' pleadings, briefs, witness statements and/or other evidence in the Washington Enforcement Proceedings.

269.     Kazakhstan relied on the pleadings, briefs, witness statements and/or other evidence submitted by Defendants in the New York § 1782 Proceedings. The U.S. District Court

for the Southern District of New York relied on Defendants' pleadings, briefs, witness statements and/or other evidence in the New York § 1782 Proceedings.

270.    The U.S. District Courts for the Southern District of New York and for the District of Massachusetts relied on Defendants' petitions in Defendants' § 1782 Proceedings.

271.    The U.S. District Court for the Southern District of New York relied, and will continue to rely, on Defendants' pleadings in the New York Enforcement Proceedings.

272.    The applicable courts in the Other European Enforcement Actions relied, and will continue to rely, on Defendants' pleadings in those proceedings.

273.    On information and belief, in relation to the above-referenced legal proceedings — the SCC Arbitration, the Swedish Annulment Proceedings, the London Enforcement Proceedings, the Washington Enforcement Proceedings, the New York § 1782 Proceedings, Defendants' § 1782 Proceedings, the New York Enforcement Proceedings and the Other European Enforcement Actions — with the intent to promote the carrying on of mail fraud and/or wire fraud., Defendants sent communications through the United States mails, private or commercial interstate carriers, and/or interstate wires in furtherance of Defendants' fraudulent scheme and/or to unjustly enrich themselves. These other communications, on information and belief, included but are not limited to communications with Defendants' counsel in the United States. Each mailing or wiring of a communication in furtherance of the fraudulent scheme is a violation of the federal mail fraud statute, 18 U.S.C. § 1341, or the federal wire fraud statute, 18 U.S.C. § 1343, and is an independent predicate act under 18 U.S.C. § 1961.

274.    Defendants' racketeering activities also include money laundering (18 U.S.C. § 1956(a)(2)(A) & (B)(i)):  Defendants, acting in concert with persons known and unknown in the United States and abroad, transported, transmitted and/or transferred monetary instruments

and/or funds from a place in the United States to or through a place outside the United States, and/or to a place in the United States from or through a place outside the United States, (a) with the intent to promote the carrying on of unlawful activity and/or (b) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer was designed to (i) conceal the nature, location, source, ownership and/or control of the proceeds of unlawful activity, 18 U.S.C. § 1956(a)(2) and 18 U.S.C. § 2, as described in paragraphs 1–252 of this Complaint, by Defendants making payments from outside the United States to counsel in the United States in relation to the above-referenced legal proceedings — the SCC Arbitration, the Swedish Annulment Proceedings, the London Enforcement Proceedings, the Washington Enforcement Proceedings, the New York § 1782 Proceedings, Defendants' § 1782 Proceedings, the New York Enforcement Proceedings and the Other European Enforcement Actions.

275.   The persons alleged herein to have violated 18 U.S.C. § 1962(c) are separate from, though employed by or associated with, the Enterprise.

276.   Each Defendant had a role in the racketeering activity that was distinct from the undertaking of those acting on its behalf. Each Defendant also attempted to benefit, and did benefit, from the activity of their employees and agents alleged herein, and thus were not passive victims of racketeering activity, but active perpetrators.

277.   Kazakhstan has been injured in its property as a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(c), including injury by reason of the predicate acts constituting the pattern of racketeering activity. Defendants have targeted Kazakhstan in the United States by attempting to enforce the fraudulently procured SCC Award in the Washington Enforcement Proceedings and New York Enforcement Proceedings, and Defendants' § 1782 Proceedings, and by attempting to quash Kazakhstan's inquiry into Defendants' fraud in the

New York § 1782 Proceedings, and Kazakhstan has been injured in the United States as a result of these, and other, actions. Kazakhstan's damages include but are not limited to the legal fees and expenses incurred by Kazakhstan in the United States as a result of Defendants' wrongful actions.

278.   As a result of the violations of 18 U.S.C. § 1962(c) by Defendants and others known and unknown, Kazakhstan has suffered substantial damages in an amount to be proved at trial.

279.   Pursuant to 18 U.S.C. § 1964(c), Kazakhstan is entitled to recover treble its general and special compensatory damages, plus interest, costs and attorneys' fees, incurred by reason of Defendants' violations of 18 U.S.C. § 1962(c).

## COUNT II

### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

### CONSPIRACY TO CONDUCT THE AFFAIRS OF THE ENTERPRISE THROUGH A PATTERN OF RACKETEERING ACTIVITY IN VIOLATION OF § 1962(C)

### (18 U.S.C. §§ 1962(d) and 1964(c))

### (Against all Defendants)

280.   Kazakhstan re-alleges and incorporates by reference each and every allegation in paragraphs 1-279 above as if fully set forth herein.

281.   From no later than July 2010, and continuing through the time of filing in this Complaint, Defendants, and others known and unknown, being persons employed by and associated with the Enterprise, did unlawfully, knowingly and intentionally conspire, combine, confederate and agree together to conduct the affairs of the Enterprise, which was engaged in, and the activities of which affected, interstate and foreign commerce, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

282.    Each Defendant agreed that at least two acts of racketeering activity would be committed by a member of the conspiracy in furtherance of the Enterprise.

283.    It was part of the conspiracy that Defendants and their co-conspirators would commit numerous acts of racketeering activity in the conduct of the affairs of the Enterprise, including but not limited to, the acts of racketeering set forth above. The pattern of racketeering activity, as defined by 18 U.S.C. §§ 1961(1) and (5) includes multiple repeated acts of:

a.    Mail Fraud, 18 U.S.C. § 1341, as described in paragraphs 1–279 of this Complaint;

b.    Wire Fraud, 18 U.S.C. § 1343, as described in paragraphs 1–279 of this Complaint; and/or

c.    Money Laundering, 18 U.S.C. § 1956(a)(2)(A) & (B)(i), as described in paragraphs 1–279 of this Complaint.

284.    In furtherance of this unlawful conspiracy, and to effect their objectives, Defendants committed numerous overt acts, including but not limited to those set forth in paragraphs 1-279 above.

285.    Kazakhstan has been injured in its property as a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(d), including injury by reason of the predicate acts constituting the pattern of racketeering activity. Defendants have targeted Kazakhstan in the United States by attempting to enforce the fraudulently procured SCC Award in the Washington Enforcement Proceedings and New York Enforcement Proceedings, and Defendants' § 1782 Proceedings, and by attempting to quash Kazakhstan's inquiry into Defendants' fraud in the New York § 1782 Proceedings, and Kazakhstan has been injured in the United States as a result of these, and other, actions. Kazakhstan's damages include but are not limited to the legal fees and

expenses incurred by Kazakhstan in the United States as a result of Defendants' wrongful actions.

286.    As a result of the conspiracies between and among Defendants and other persons and entities operating at their direction to violate 18 U.S.C. § 1962(c), Kazakhstan has suffered substantial damages, in an amount to be proved at trial.

287.    Pursuant to 18 U.S.C. § 1964(c), Kazakhstan is entitled to recover treble its general and special compensatory damages, plus interest, costs and attorneys' fees, by reason of Defendants' violations of 18 U.S.C. § 1962(d).

<u>**COUNT III**</u>
<u>**FRAUD**</u>

**(Against all Defendants)**

288.    Kazakhstan re-alleges and incorporates by reference each and every allegation in paragraphs 1-279 above as if fully set forth herein.

289.    Defendants knowingly misrepresented, omitted, and/or concealed material facts from Kazakhstan in multiple circumstances, as alleged above.

290.    Defendants made these misrepresentations and/or omissions while knowing that their misrepresentations and/or omissions were material.

291.    Defendants made these misrepresentations and/or omissions with the intent of defrauding Kazakhstan.

292.    These material misrepresentations and/or omissions have been reasonably and justifiably relied upon by Kazakhstan.

293.    As a direct, proximate and foreseeable result of Defendants' fraud, Kazakhstan has been injured, including the suffering of significant pecuniary and other damages.

294.    Defendants have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Kazakhstan is entitled to, and should be awarded punitive damages from each Defendant.

## COUNT IV
## CIVIL CONSPIRACY

### (Against All Defendants)

295.    Kazakhstan re-alleges and incorporates by reference each and every allegation in paragraphs 1-279 above as if fully set forth herein.

296.    As set forth above, Defendants have committed torts against Kazakhstan, including fraud and acts of racketeering giving rise to violations of RICO.

297.    Defendants intentionally participated in the furtherance of a common plan or purpose to obtain money and property from Kazakhstan. In furtherance of this plan or purpose, Defendants committed overt and unlawful acts, including fraud and acts of racketeering as alleged herein.

298.    As a direct and proximate result of Defendants' conspiracy, the overt acts committed in furtherance of that conspiracy, and the torts committed against Kazakhstan, Kazakhstan has been damaged in its property, and further damage to Kazakhstan's property is threatened or imminent.

299.    Defendants have engaged in the malicious, willful and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Kazakhstan is entitled to, and should be awarded, punitive damages from each Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Kazakhstan prays for judgment against all Defendants jointly and severally, as follows:

A.      judgment in an amount equal to three times the damage caused to Kazakhstan by Defendants' racketeering activity, pursuant to 18 U.S.C. § 1964(c);

B.      a permanent injunction prohibiting Defendants from filing or prosecuting

      (i)      any action in the United States for enforcement, confirmation or recognition of the SCC Award,

      (ii)     any action in the United States for enforcement, confirmation or recognition of any foreign judgment relating to the SCC Award, including but not limited to any foreign judgment enforcing, confirming, or recognizing the SCC Award,

      (iii)    any action in the United States seeking the seizure or attachment of assets based on any foreign judgment relating to the SCC Award, including but not limited to any foreign judgment enforcing, confirming, or recognizing the SCC Award, and

      (iv)    any action in the United States pursuant to 28 U.S.C. § 1782 seeking discovery in aid of foreign proceedings relating to the SCC Award;

C.      compensatory damages in an amount to be proven at trial;

D.      punitive damages in an amount to be proven at trial;

E.      attorneys' fees, pursuant to 18 U.S.C. § 1964;

F.      trial by jury, pursuant to Fed. R. Civ. P. 38; and

G.      for any other relief the Court deems just and proper.

Respectfully Submitted,

*/s/ Matthew H. Kirtland*

Matthew H. Kirtland (D.C. Bar No. 456006)
Kara P. Wheatley (D.C. Bar No. 975541)
Rebecca E. Bazan (D.C. Bar No. 994246)
NORTON ROSE FULBRIGHT US LLP
799 9th St. NW, Suite 1000
Washington, D.C. 20001
Telephone: (202) 662-0200
Facsimile: (202) 662-4643

ATTORNEYS FOR PLAINTIFF
REPUBLIC OF KAZAKHSTAN

Dated this 5th day of October, 2017