# EXHIBIT A

Neutral Citation Number: [2018] EWHC 1130 (Comm)

Case No: CL-2014-000070

**IN THE HIGH COURT OF JUSTICE**
**THE BUSINESS AND PROPERTY COURTS OF ENGLAND & WALES**
**COMMERCIAL COURT (QBD)**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 11/05/2018

Before :

**MR JUSTICE ROBIN KNOWLES CBE**

- - - - - - - - - - - - - - - - - - - - -

Between :

(1) ANATOLIE STATI

(2) GABRIEL STATI

(3) ASCOM GROUP SA

(4) TERRA RAF TRANS TRAIDING LTD   **Claimants**

- and -

THE REPUBLIC OF KAZAKHSTAN   **Defendant**

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Thomas K Sprange QC and Kabir Bhalla** (of **King & Spalding International LLP**) for the **Claimants**

**Ali Malek QC, Christopher Harris, Paul Choon Kiat Wee and Dominic Kennelly** (instructed by **Herbert Smith Freehills LLP**) for the **Defendant**

Hearing dates: 26 March 2018

- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.

………………………..

MR JUSTICE ROBIN KNOWLES CBE

**Mr Justice Robin Knowles:**

**Introduction**

1. In this judgment I will refer to Mr Anatolie Stati, Mr Gabriel Stati, Ascom Group SA and Terra Raf Trans Traiding Ltd as "the Statis" and to the Republic of Kazakhstan as "the State".

2. The Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("the New York Convention") was adopted by the United Nations Conference on International Commercial Arbitration on 10 June 1958. In England and Wales sections 100 to 103 of the Arbitration Act 1996 ("the 1996 Act") concern recognition and enforcement in this jurisdiction of arbitration awards made, in pursuance of an arbitration agreement, in the territory of a state (other than the United Kingdom) which is a party to the New York Convention.

3. Sweden is a party to the New York Convention. An arbitration award dated 19 December 2013 ("the Award") was made in favour of the Statis and against the State in an international investment arbitration seated in Sweden. The amount of the Award is of the order of US$500 million.

4. By arbitration claim form dated 24 February 2014 the Statis invoked the jurisdiction of the Courts of England and Wales under section 101 of the 1996 Act. They applied for permission under section 101(2) to enforce the Award against the State in the same manner as a judgment or order to the same effect. Under section 101(3) they asked for permission to enter judgment in England and Wales in the terms of the Award.

5. Adopting the standard procedure for this type of application, the Statis made the application without notice to the State. On 28 February 2014 the Statis were granted permission to enforce the Award by order of Burton J.

6. Again adopting the standard procedure, Burton J ordered that the State might apply within 21 days of service to set aside his order and that the Award was not to be enforced until the end of that period or until an application made by the State within that period had been finally disposed of.

7. Exercising its entitlement, the State applied to set the order aside. In amended form the application by the State to set aside the order of Burton J alleged that the Award had been obtained by fraud. I directed on 27 June 2017 that the State's claim that (in summary) the Award was obtained by fraud should proceed to trial as if commenced under Part 7 of the Civil Procedure Rules (the "CPR").

8. I did so for reasons given in a judgment dated 6 June 2017 [2017] EWHC (Comm) 1348; [2017] 2 Lloyd's Rep 201, after two days of argument. I had found that there was prima facie evidence of fraud (as there described), and of fraud (again as there described) by the Statis on the arbitral tribunal, and that there was the necessary strength of prima facie case that the alleged fraud would have made a difference to the tribunal. I was also satisfied that the State did not have access before the Award to the evidence of the alleged fraud on which it now sought to rely, and that the evidence of the alleged fraud could not with reasonable diligence have been discovered before the

Award. I held that the interests of justice required the examination that a trial will allow.

9. In circumstances that I will examine in this judgment, the Statis no longer wish to proceed to a final determination. They have used the procedure under the CPR for discontinuing a claim, serving a notice of discontinuance.

10. The State on the other hand wishes to proceed to a final determination on the merits. The State contends that matters have reached the stage where it has its own claim for declarations. Alternatively the State contends that the Court's power to set aside the notice of discontinuance should be used so that the question of enforceability in this jurisdiction is heard and decided on the Statis' claim for permission to enforce the Award and to enter judgment.

11. Proceedings to challenge the Award in Sweden, the court of the seat, have recently been concluded at the highest level in favour of the Statis. Assets of the State have been attached in Sweden to the value of around US$100 million in total.

12. There are now enforcement proceedings in various parts of the world. I understand them all to be contested. It is said that US$28 billion of assets are currently subject to attachments.

13. The dispute between the parties has been hard fought at every stage, and the current proceedings are no exception. While the State accuses the Statis of fraud in obtaining the Award, the Statis say they are victims of a longstanding unlawful campaign by the State.

**The proceedings in this jurisdiction**

14. For the English Court to permit a party to pursue, to a trial of the issues, an allegation that a New York Convention award was obtained by fraud, normally two conditions will require to be fulfilled: Westacre Investments Inc v Jugoimport-SPDR Holding Co Ltd [2000] QB 288 (CA) at 309F per Waller LJ (dissenting in the result).

15. The first condition is "that the evidence to establish the fraud was not available to the party alleging the fraud at the time of the hearing before the arbitrators": Westacre, above, at 309F, but noting the qualification at G-H. The second condition is that "there is a prima facie case of fraud which is sufficient to overcome the extreme caution of the Court when invited to set aside an award on the grounds of public policy": IPCO (Nigeria) Limited v Nigerian National Petroleum Corporation [2015] EWCA Civ 1144; [2016] 1 Lloyd's Rep 5 at [191] per Christopher Clarke LJ.

16. I concluded on 6 June 2017 that these conditions were met. I also had to reach conclusions on what had and had not been decided by Courts of the United States and of Sweden. As regards the Swedish Court, as the court of the seat of the arbitration, in my judgment of 6 June 2017 I explained what I understood had and had not been addressed and decided by the Swedish Court and why, as I respectfully saw the position, the State's fraud claim (as described and examined in my judgment) had not been concluded by what had been decided by the Swedish Court. That remains the case notwithstanding that matters have since been considered at a higher level in Sweden.

17. Pursuant to directions for trial in the order dated 27 June 2017, the State and the Statis exchanged statements of case. The trial was fixed to commence on 31 October 2018 (and that time remains held in the Court's diary). Disclosure of documents was due to take place on 22 February 2018 but on that day the Statis sought an extension of time to 1 March 2018 for disclosure of documents. The State agreed the extension.

**The notice of discontinuance and the reasons for it**

18. The Statis never gave disclosure of documents because the next thing, without warning and unaccompanied by any explanation, was the notice of discontinuance from the Statis.

19. This is an extraordinary development. The Statis have not conceded that the State was correct about the Award. Indeed the Statis wish to continue enforcement efforts in other countries. And in their written argument for this hearing they say they "would relish the opportunity to proceed to trial with respect to the fraud allegations", and that apart from two reasons given they have an "otherwise strong desire to proceed to trial and defeat the fraud claims".

20. The Statis volunteer two reasons or explanations. The first is that they do not have the resources to continue to a trial here. The second is that they have secured attachment orders in other countries sufficient for there to be no longer a practical need to pursue enforcement here.

21. The State, by Mr Ali Malek QC, says that the first explanation is false and the second is not the real reason. The real reason, says the State, is that the Statis have no answer to the question that was directed to be tried here.

22. The explanations offered by the Statis are not explanations that I accept on the material available.

23. As to the first, the Statis say that litigation funders have "carved out" the English proceedings from funding arrangements, and that the Statis do not have the resources themselves. Yet I find no documents to support this, and no details of their own resources, or of the exchanges with third party funders. The explanation moreover does not sit credibly with the timing of the service of the notice of discontinuance, which was after rather than before time and money would have been spent preparing to give disclosure of documents.

24. Similarly the suggestion that the notice of discontinuance was given because the Statis have secured attachment orders in other countries sufficient for there to be no longer a practical need to pursue enforcement here does not sit credibly with the timing of those attachments. The notice of discontinuance did not come just as attachments were achieved overseas; it came just as disclosure of documents was about to take place here. The Statis had not said to the State or to this Court that they might wish to discontinue if they achieved attachments elsewhere. Indeed, in an action consistent with an intention to continue despite the attachments elsewhere, just before the notice of discontinuance the Statis requested a short further period of time in which to give disclosure of documents.

25. Should I accept the alternative explanation urged by Mr Malek QC, that the real reason for the notice of discontinuance is that the Statis have no answer to the

question that has been directed to be tried here? I do not believe that I should go that far. Whether there is an answer to the question is a matter for the trial. I am however prepared to hold that the real reason for the notice of discontinuance is that the Statis do not wish to take the risk that the trial may lead to findings against them and in favour of the State.

**The notice to set aside and the reason for it**

26. Within the time required by the CPR the State applied to set aside the notice of discontinuance so that the trial would take place.

27. I accept that the reason for the State wanting the trial to take place is because it wishes to complete the opportunity to prove that the Award was obtained by fraud. It has already invested substantial time and money in these proceedings since the Statis invoked the jurisdiction of this Court.

28. As part of their response, the Statis refer to a fraud claim brought against them by the State in the United States. The claim invokes the RICO (Racketeer Influenced and Corrupt Organizations Act) jurisdiction in the United States. The Statis say that that fraud claim will consider every aspect of the fraud alleged in the proceedings here, and more, and after a trial involving full disclosure and oral evidence.

29. That claim in the United States is at an early stage, and as a result I do not feel confident in weighing its ultimate implications. I certainly cannot assume there will be the trial in the United States to which the Statis refer. Mr Malek QC anticipates a jurisdiction challenge in the United States from the Statis. Mr Thomas Sprange QC, for the Statis was, understandably, not in a position to say that that would not happen. It is to be noted that the Statis have sought discontinuance here and not a stay of proceedings here on the grounds that the issues will be litigated in the United States.

**Freestanding claims by the State in this jurisdiction?**

30. The State's first argument is that it has freestanding claims for remedies in these proceedings before this Court which are unaffected by the notice of discontinuance.

31. The freestanding claims to which the State refers are claims for declarations. There is also a claim for indemnity costs that the Court should, says the State, take into account.

32. As to the first, it is true that the State by its statement of case asks the Court to make declarations that the Award was obtained by fraud. But is this Court in fact engaged with more than a defence to the Statis' claim for recognition and enforcement of the Award? It is hard to see that this Court would have been an appropriate forum in which to seek these declarations if recognition and enforcement were not sought here or in prospect. This Court was not chosen as the court of the seat. The parties and the dispute that went to arbitration, and the arbitration itself, have no material connection with this jurisdiction other than through the Statis' claim for recognition and enforcement of the Award.

33. However the State argues that the effect of the notice of discontinuance in this particular case turns on its own particular features. Paragraph 2 of the order dated 27

June 2017 for the trial gives effect, it is argued, to the reality in this particular case when it provides for "[the State's] claim that the Award was obtained by fraud shall proceed to trial as if commenced under CPR Part 7 …".

34. The claims for declarations by the State are not, it is argued, dependent for their existence on the claim by the Statis for enforcement. The State argues that the case has enough formality to enable the claims for declarations to survive the discontinuance of the claim for enforcement.

35. The State adds, by reference to the definition of counterclaim under the CPR, and to CPR 20.2 and 20.3, and without suggesting that the point need be decided in the present case, that as award debtor it should be treated as in substance the claimant.

36. In my judgment Mr Sprange QC for the Statis meets these arguments successfully. He too starts from the place of the real question being who is the claimant and who is the defendant. He points out that within the rules under which the claim was issued the Statis are the claimants and the State is the defendant. I consider that he is correct in submitting that paragraph 2 of the order of 27 June 2017 simply sets out the framework under which the parties' contentions would be set out.

37. In Gater Assets Ltd v Nak Naftogaz Ukrainiy [2007] EWCA Civ 988; [2007] 2 Lloyd's 588 at [78] Rix LJ, whilst carefully discussing the exercise of discretion in the context of security for costs, noted that in an issue ordered to be tried in connection with an application to set aside an enforcement order under CPR Part 62 "the award debtor might well be defined as the claimant, effective and formal". Reading the discussion as a whole, I do not consider that Rix LJ was examining whether the award debtor was to be treated as a claimant for all purposes under the CPR. I do not consider it a reliable course to transpose the discussion there to the different context under discussion here.

38. As to the claim for indemnity costs, I am quite clear that in the present case it is not necessary to have a trial of the question whether the Award was obtained by fraud in order to decide a question about indemnity costs. Nor would it be appropriate by reference to the overriding objective. The Court already has ample material with which to decide questions of costs alone.

**Setting aside the notice of discontinuance: approach**

39. The State's second argument is, in my view, the more important of its two arguments. The State contends that the Court should exercise its power to set aside the notice of discontinuance, to allow the trial to take place.

40. CPR 38.4(1) provides that "[w]here a claimant discontinues under rule 38.2(1) the defendant may apply to have the notice of discontinuance set aside."

41. In The High Commissioner for Pakistan in the United Kingdom v National Westminster Bank plc [2015] EWHC 55 (Ch) at [40] to [47] Henderson J (as he then was) examined the position in these terms:

> "As with all provisions in the CPR, this rule must be construed, and the discretion under it exercised, with the aim of furthering the overriding objective. …

> I consider that the Court should approach an application to set aside a notice of discontinuance under rule 38.4(1) on the basis that the Court has a discretion which it should exercise with the aim of giving effect to the overriding objective of dealing with the case justly and at proportionate cost. If the facts disclose an abuse of the Court's process, that will no doubt continue to be a powerful factor in favour of granting the application; but it would in my view be wrong to treat abuse of process as either a necessary or an exclusive criterion which has to be satisfied if the application is to succeed."

Henderson J went on to cite and express his agreement with a discussion of the jurisdiction by Aikens J in <u>Sheltam Rail Co (Proprietary) Ltd v Mirambo Holdings Ltd</u> [2008] EWHC 829 (Comm), [2009] Bus LR 302 which concluded with the sentence:

> "A Court must … be entitled to consider both the circumstances in which the notice of discontinuance was issued and what the claimant is attempting to achieve by issuing and serving the notice."

42. Henderson J's interpretation and explanation has been followed in other cases since. Further, a number of other authorities were cited but they were each very different on their facts and I did not find them of assistance in reaching a decision in the present case.

43. Mr Sprange QC for the Statis argued that the key consideration in a decision whether to allow discontinuance should be the presence or absence of abuse of process, but in my judgment that is too narrow an approach. When present it will be highly material, but its absence leaves the jurisdiction intact; and the discretion should not be approached with the gloss that abuse of process is "the key consideration". The position is plainly and simply, as Henderson J made clear, that "the Court has a discretion which it should exercise with the aim of giving effect to the overriding objective of dealing with the case justly and at proportionate cost".

44. Mr Sprange QC made the point that a party is entitled to discontinue without explanation. He is correct that there is not an express requirement under the CPR that a party give an explanation when serving a notice of discontinuance in circumstances that do not require the Court's prior leave under the CPR. However if there is an application to set aside the notice the Court will examine what the notice was attempting to achieve and the reason for it. The Court may do the same in circumstances that do require the Court's prior leave under the CPR.

45. It is to be welcomed that the overriding objective will apply when a party wishes to end a case, as at any other stage in a case. It is also clear that the matter requires consideration of what is fair to all parties to the case, and not just to the party that wishes to discontinue. The CPR provides that the overriding objective of dealing with a case justly and at proportionate cost "includes, so far as practicable" ensuring that the case is dealt with expeditiously and fairly, and allotting to it an appropriate share of the Court's resources. The latter reference to the Court's resources requires the Court to consider the impact, at least generally, on other parties in other cases.

46. Consistently, where the CPR allows a claimant to serve a notice of discontinuance that does not signify that the claimant has a right to discontinue. It is simply a procedural first step which will allow the matter to be judicially considered in the event that another party requires that. The procedural first step offers efficiency in

that, under the CPR, specified consequences will hold should no application to set aside be made.

**Exercising the discretion in the present case; giving effect to the overriding objective**

47. The Statis argue that the notice of discontinuance has the effect of the State succeeding on the only remedies sought in this jurisdiction, the remedies of recognition and enforcement. Finality is achieved, it is argued, by an offer (made in the written argument for the Statis for this hearing) of an undertaking by the Statis confirming that they will not pursue further proceedings in England. Mr Sprange QC clarified in oral argument that that undertaking would be for all time and in any circumstance. The State's costs will also be paid, it is emphasised, at least on the standard basis of assessment.

48. The State argues that this analysis is far from complete, and that dealing with cases justly makes it permissible to have regard to legitimate private interest and wider public interest. Mr Malek QC argues that having elected to enforce the Award in England, the Statis have put the State to substantial expense in proving its fraud claim. These proceedings are at an advanced stage. Mr Malek QC urges that in the present case an award creditor has used the process of this Court to secure an order ex parte, and would have proceeded to enforce. The Court has been led to make an order on the apparent merits and the question whether that order should be set aside on the merits remains. Once (as here) a prima facie case of fraud is established against an award creditor then it should not be allowed to disengage.

49. The question of whether the Award was obtained by fraud remains, Mr Malek QC continues, a live issue between the parties because the Statis are pursuing enforcement proceedings in multiple jurisdictions in Europe and the United States. A judgment of this Court will involve detailed findings on the question, with the benefit of disclosure and after hearing full evidence at trial. This will, he argues, have significant practical advantages for the State and although each foreign court will have to consider its own domestic public policy for itself, those courts will nonetheless be assisted. A determination is also important for the State given the reputational issues in refusing to pay an international investment arbitration award. The State of course accepts that court resources are a relevant consideration. However it points to what is at stake (financially and reputationally) as considerable, that the stage reached in the proceedings is relatively advanced, that judicial time has already been invested, and that the trial will be concise.

50. A decision of the English Court at trial would, Mr Sprange QC emphasises, be confined to questions of English public policy, and that would involve taking time to determine what he described as "a dead issue". There should be no question of proceeding to "an unsolicited advisory judgment on whether the recognition of a New York Convention award is consistent with English public policy". Other jurisdictions, he argues, have already shown they see public policy differently to the English Court. Mr Sprange QC suggests that to compel a trial would be to elevate the English Court, which is not the court of the seat, to an international arbitration policeman or Court. The Statis contend that the relevant foreign Courts will give greater weight to the decision of the Swedish Court as the court of the seat. Mr Sprange QC adds that the Statis will have to fight the fraud allegation anyway in other jurisdictions and in the

51. In relation to public interest, <u>Cherkasov and Others v Nogotkov Kirill Oleagovich, the Official Receiver of Danyaya Step LLC (in liquidation)</u> [2017] EWHC 3153 (Ch) at [60]-[64] and [71]-[83] was cited by the State as a recent example of the Court being prepared to adjudicate where there are no longer live issues, if the public interest requires. Sir Geoffrey Vos CHC concluded at [83]:

    > "The Court cannot willingly accept a situation in which one party can prevent it determining, where it is in the public interest to do so, whether its procedures have been flouted or abused."

    Mr Sprange QC cautions that one must take this jurisdiction carefully as otherwise it will be overapplied. He emphasises that the facts and circumstances of <u>Cherkasov</u> are very different from the present case.

**Other jurisdictions**

52. In light of some of the submissions made, I should also review the evidence of the current position in jurisdictions other than Sweden (which I have dealt with in my judgment of 6 June 2017 and above). I shall try to do so concisely, assisted by a schedule exchanged between the parties, and recognising that the picture will be constantly changing.

53. In Belgium, the Statis have applied and obtained exequatur ex parte and the State has applied to set that aside. The exequatur order obtained ex parte recites that the Statis "rightly point out" that "according to the Swedish Courts the existence of a potential fraud did not have any impact on the arbitral awards". Meanwhile, assets of the State's National Fund of around US$22.6 billion held by BNY Mellon have been attached since last year.

54. In Luxembourg, the Statis have applied for exequatur and the State has responded to that application. Meanwhile, assets of the State were attached in August and December last year.

55. In the Netherlands, the Statis have commenced enforcement proceedings. Meanwhile, assets of the State, including assets of its National Fund, were attached in August and September last year but lifted as regards National Fund assets on 23 January 2018.

56. The parties disagree, but it is possible that an English judgment following a trial here would be available before a decision on the application to set aside exequatur in Belgium, a final decision on the application for exequatur in Luxembourg and a final decision on enforcement in the Netherlands.

57. Of course it is possible that the Courts of Belgium, Luxembourg and the Netherlands will take the same view of the matters as the Swedish Courts have. But that is not certain, given what the Swedish Courts have not decided. The parties disagree over the weight or evidential value that may be given to an English judgment following a trial here of the allegations of fraud, but it is possible that it will be of assistance and that some weight or evidential value will be given in Belgium, Luxembourg and the Netherlands.

58. Indeed in the case of the Netherlands it appears to be common ground that an English judgment would be given some weight although (on the Statis' case) less weight than the decision of the Swedish Court. However the Netherlands Court refused a request by the State for stay of the enforcement proceedings there until an English judgment following a trial here of the allegations of fraud.

59. Leaving aside the RICO proceedings (referred to above), in the US, on 6 November 2017 the US District Court for the District of Columbia lifted a stay on enforcement that had been put in place pending the resolution of the Swedish proceedings. On 23 March 2018 it issued an order granting the Statis' petition for confirmation of the Award. An appeal process lies ahead. Proceedings in New York to enforce a Swedish judgment based on the Award are at an early stage. The parties disagree, but it is possible that an English judgment following a trial here would be available before proceedings before the US Courts are complete and that it would be of assistance and given some weight.

**Decision on setting aside the notice of discontinuance**

60. Guided by the overriding objective I am persuaded that I should exercise my discretion to set aside the notice of discontinuance. Whilst the merits remain in issue, this matter will proceed to trial so that they may be determined. If this is an exceptional conclusion, this is an exceptional case.

61. The question of whether the English Court would enforce the Award, and allow a judgment of the English Court to be entered in the terms of the Award, was first put to it by the Statis. It remains a question that the State would wish to be answered. The State has a legitimate interest in seeking to have the order of Burton J set aside on the merits.

62. As noted above the Statis said in their written argument for this hearing they "would relish the opportunity to proceed to trial with respect to the fraud allegations", and that apart from two reasons given they have an "otherwise strong desire to proceed to trial and defeat the fraud claims". As I have explained, I do not accept that the two reasons given by the Statis to this Court are the actual reasons for their seeking to discontinue. Among other things I do not accept that they are unable to afford to answer the allegations of fraud made against them. This is therefore no obstacle to the opportunity that the Statis have told this Court they would "relish".

63. In the context of a global multi-jurisdiction enforcement exercise by the Statis I respectfully take the view that it will not be without use to the Courts of at least some other countries to have a concluded answer on the question of fraud described in my judgment of 6 June 2017, and therefore on the question whether the English Court would enforce the Award.

64. That will not be an answer from the court of the seat of the arbitration but it will be an answer from the Court of a jurisdiction to which all parties have submitted. The context of the utility of an answer includes the fact, as I respectfully concluded in my judgment dated 6 June 2017, that the Swedish Courts, as courts of the seat, have not determined the question of fraud discussed in that judgment. I add that the important, and relevant, thing is not an answer to a question of English public policy but an answer to the question whether there was the fraud described.

65. That question can be determined here this year, with the benefit of disclosure and after hearing full evidence at trial. This can only assist the interests of finality.

66. The trial here was ordered after a major application that showed the State's allegations to be far from speculative. The parties have already invested substantially in these proceedings and have reached a point of near readiness for disclosure. This progress towards a decision, one way or the other, on the merits will be wasted if one side is permitted to discontinue without concession or conclusion on the merits.

67. The resources to be committed ahead by the Court itself are reasonable, and there is good reason to make the most of the resources of the Court that have already been used. Progression to trial is not disproportionate given the very substantial sums involved and the importance of the case, to all parties. The arrangements for trial will ensure that the matter is dealt with expeditiously and fairly.